[File No. Cr. 203.]

STATE OF NORTH DAKOTA, Respondent, v. FRANK MYERS, an Alleged Delinquent Child of Mrs. Eva Myers, and Eva Myers, Appellants.

(22 NW2d 199)

Opinion filed February 4, 1946

*J. E. Hendrickson,* for appellants.

*Ralph F. Croal,* State's Attorney, and *John Pollock,* Juvenile Commissioner, for respondent.

Burke, J. The appellant, Frank Myers, was adjudged a delinquent minor in juvenile court of Cass County and committed to the State Training School. Both he and his mother, Eva Myers, have appealed from the order of commitment and have asked a trial anew in this court upon the entire record in the case. Appellants' request for a trial de novo is a proper one. Section 27–1632, Rev Code 1943, provides: "Any order made by this court (juvenile court) may be reviewed or appealed in the manner provided for the review of civil cases."

Section 28–2732, Rev Code 1943, relating to judicial procedure in civil cases, insofar as it is pertinent, reads as follows: "On appeal in any action tried by the court, without a jury, whether triable to a jury or not . . . . The supreme court shall try anew the questions of fact specified in the statement or in the entire case, if the appellant demands a retrial of the entire case, and shall finally dispose of the same whenever jus-

tice can be done without a new trial . . . ." It is thus clear, that where it is demanded a trial de novo is an appellant's statutory right on an appeal from juvenile court.

There are two questions in the case. 1. Does the record establish that Frank Myers is delinquent in the degree which the statute requires as a jurisdictional basis for an order with respect to his custody? 2. The jurisdictional basis being established, was the order of commitment to the State Training School for the best interests of Frank Myers and the State of North Dakota?

The record discloses that Frank, who was 16 years old on November 7, 1945, is one of four sons of Eva Myers. When he was two years old the Myers' home was broken by divorce and Frank and his brothers were given into the mother's custody. Mrs. Myers worked as a cook in the Fargo Bus Depot and at other jobs. She kept her family together until 1941, when all four boys were committed to institutional care at the Lake Park Children's Home because of their mother's inability to provide for their support. In 1943, Mrs. Myers secured employment as a waitress in the Waldorf Liquor Store which has been described in the record and argument in the case as a "cocktail lounge" and "night club." She is still so employed. Her wages are twenty-five dollars a week and she testified that her tips average about the same amount.

In the spring of 1944, at the close of the school year, Frank left the Children's Home at Lake Park with the approval of all interested parties. He secured employment at Hope, N. D., as a farm hand. He worked the entire summer in this employment and earned $125.00. In the fall he came to Fargo to live with his mother. He entered the ninth grade at the Roosevelt Junior High School. After school hours he worked at odd employments including the setting of pins in bowling alleys. He completed his school work with satisfactory grades and was promoted to the tenth grade. As soon as school was out in the summer of 1945, he found employment doing odd jobs of yard work. In July and August he worked for the Northern States Power Company doing a man's work as an ordinary laborer.

He worked an eight hour day and was paid 73½ cents an hour. His employer has testified to his ability and dependability. At the beginning of the current school year, he left this employment and entered the tenth grade at Fargo High School. In addition to his regular school work, he became a member of the football squad and continued to engage in gainful employment after school hours.

During all of the time after he left the Children's Home at Lake Park, Frank has purchased all of his clothes with his own earnings. At all times he has given his mother money to help defray their living expense and during the time he worked for the Northern States Power Company he paid her twenty dollars a month. At the time of the hearing in this case, on September 17, 1945, he had a balance of $185.00 in his savings account with the Northwestern Savings and Loan Assn., he had $200.00 in war bonds which he had purchased with his own savings and a $50.00 war bond which his mother had given him.

It appeared, however, that in March 1945, Frank was invited by two girl acquaintances to attend a party at the home of a Mrs. Selstrom, a place which later achieved scandalous notoriety. Frank attended this party and thereafter became one of a group of boys and girls who frequented this home. Mrs. Selstrom is a vicious woman. She is 24 years of age and while her husband was away in the army, made her home a rendezvous where boys and girls who were scarcely more than children might gather to engage in practices condemned both by the moral law and the law of the land. There they learned to drink intoxicating beverages purchased by Mrs. Selstrom for the most part with money they contributed for the purpose. There, some of them at least, learned and were afforded an opportunity to engage in sex delinquency. No doubt, their hostess was preceptress as well for she took one of the boys as her own paramour.

It is not contended that Frank was a participant in these immoral practices to the extent that others were. He stated that for the most part he just sat around and listened to the phonograph. He drank some of the whiskey and beer that were pro-

vided and on one occasion "loaned" Mrs. Selstrom two dollars with which she purchased intoxicating liquor. On another occasion he slept all night on the floor at the Selstrom home while Mrs. Selstrom and her particular friend occupied a bed in another room. The juvenile commissioner who investigated the affair thoroughly stated "as far as I know there is no question of sex delinquency in which he (Frank) was involved." Nevertheless, there is no question but that Frank was aware of what took place at the Selstrom home, and knowing it, he continued to go there until an automobile accident early in August 1945, focused official attention upon the disgraceful situation.

Section 27–1608, Rev Code 1943, provides:

"Except as otherwise provided by law, the court (juvenile) shall have original jurisdiction in all proceedings:

1. Concerning any child residing in or who is temporarily within the county:

    a. . . .

    b. . . .

    c. Who habitually associates with dissolute, vicious, or immoral persons, or who is leading an immoral or vicious life. . . ."

Clearly Frank's conduct was such as to bring him within the provisions of subsection c, supra, and the juvenile court therefore had jurisdiction to make an order with respect to his custody.

We thus reach the second question. Was the order committing Frank to the State Training School for his best interests and for the best interests of the State of North Dakota? The order of the juvenile judge makes it clear, that in reaching his decision he took into consideration the scandalous nature of the Selstrom affair as a whole, Frank's individual delinquency, the commitments that he had ordered in the cases of other participants in that affair who had been before him, the moral atmosphere of the City of Fargo, the fact that Frank's mother's working hours, which were from 6 o'clock p.m. until 1 o'clock

a.m. made his supervision by her difficult, and the deterrent effect which the commitment would have upon other juveniles.

We realize that proper disposition of cases of juvenile delinquency requires a delicate balancing of mixed considerations and that even the most careful weighing of pertinent factors can only result in conclusions that are speculative to the extent that they attempt to predict the course of future events. Confidence that a correct conclusion has been reached must of necessity rest upon hope founded in experience, rather than on certainty. We think therefore that the problem should be approached in a spirit of optimism and that drastic remedies should not be invoked where we can have reasonable hope that lesser ones will have an equal if not a complete success.

What then are the factors to be considered and what relative weight is to be given to each? To what extent is the welfare of an individual delinquent to be counterbalanced by the good of the state? In one sense, a decision, which will help quiet public indignation over a scandalous condition which has arisen in a community, or which, because of its severity, will act as a forbidding example to other youngsters, may be said to be for the good of the state. But we do not think that, as used in the juvenile act, the phrase can be given such a broad interpretation. Considerations of expediency, the satisfaction of public indignation, or example are contrary to the whole spirit of the juvenile act. They are dependent on publicity to be effective for any purpose and all proceedings in juvenile court are declared by statute to be "confidential." Section 27–1606, Rev Code 1943. We therefore hold that the good of the State requires a child to be removed from a community only when his delinquency is such that he has become a danger to society either because of his own conduct or his influence upon others.

Whether Frank's influence will be detrimental to others depends largely upon what his future conduct will be. The question of what is best for the State is therefore inextricably intertwined with the question of what is best for Frank. The record shows that Frank has need for supervision. It also shows that he has not had proper supervision at home and that

because of her working hours it will be difficult for his mother to give him the kind of supervision he needs. This situation, however, does not of necessity require a commitment to the State Training School. That institution is not without its disadvantages. Certainly if we can have reasonable hope that other measures will suffice, we should not resort to a commitment to the Training School. In this case we have that hope. The record does not disclose that Frank is incorrigible but rather that he has respect for parental authority. There is nothing in the record to indicate that Mrs. Myers, his mother, is not a fit person to exercise that authority. It is true, that in the past that authority was not sufficient to keep Frank from being led astray. But circumstances have changed. The source of Frank's contamination has been removed. His more vicious associates are no longer in Fargo. It is only at the State Training School that he could continue those associations. Mrs. Myers had not been aware of the nature of all of her son's activities. The evening he slept all night at the Selstrom home she thought that he was staying at the home of one of his school friends. It was not disclosed to her that his intimates were other than what they should be. Nevertheless, when he stayed out late nights she punished him by not permitting him to go out at all for a stated period. Now both Frank and his mother have undergone a difficult experience and we think the record shows them both to be people who will profit by that experience.

During the course of the argument considerable stress was laid upon a letter written by Frank to one of his acquaintances. This letter adds nothing to what we have already stated to be the nature of Frank's delinquency. In fact it is in his favor as well as it is against him, because it shows he was amenable to his mother's orders.

After a full consideration of all the evidence we have concluded that it is not for Frank's best interests to commit him to the State Training School. We think that he has demonstrated traits of character that entitle him to another chance to show he can accommodate himself to the normal healthy life society requires of a sixteen year old boy. We think this end

may be obtained under the mother's supervision if she has the full and friendly cooperation of the juvenile authorities. The order committing Frank Myers to the State Training School is therefore reversed and the case remanded to the Juvenile Court of Cass County.

CHRISTIANSON, Ch. J., and NUESSLE and MORRIS, JJ., concur.

BURR, J. (concurring specially). The statement in the foregoing decision, regarding the acts of the juvenile concerned, is to say the least, as favorable to him as is warranted. But the serious situation in which this boy finds himself is a matter of his own choosing, as well as that of home and social environment. Thus this court, as well as the juvenile court, is convinced he is a delinquent.

The record shows that some of the others involved in the same transactions were committed to the training school by the juvenile court. He is not being singled out, though some others were not committed. The juvenile court which had the whole sordid matter before it—and it is a situation which the opinions herein do not adequately describe for reasons quite obvious—has not completed its adjustment.

There is intimation that disposition of some more seriously involved had not yet been determined. The problem here, however, is what to do with *this* boy. The juvenile court was confronted with a condition and not a theory—an extremely serious situation involving numerous people.

The boy is shown to be industrious and thrifty. The situation in which he is involved centers around drinking parties in which he participated, drinking associations and the consequent results that promote immorality. He is in bad company of his own choosing and with evidence, patent to him, which should have caused him to avoid it.

The record shows considerable effort to find a place where he could be sent for proper supervision. Nothing came of this, except, apparently, a choice between commitment to the training school, or of leaving the boy in the custody of his mother.

These seem to have been the alternatives left to the juvenile court, and the court states the boy should not remain in Fargo.

The juvenile court, far better acquainted with the actual state of affairs than we, felt the mother was not a fit person to have supervision. I can not subscribe to the assumption in the opinion that he should be left under the influence of his mother. I see nothing in the record which suggests any improvement in him under her supervision. Confessedly she is engaged in the very business of promoting such a situation. For over two years she has been a barmaid in a liquor store serving intoxicating liquor to customers; and this very business of hers is an inducement for her son to do as others are doing. She seems to think that because she earns $25 a week with an average of $20 per week tips in addition, and is thus employed she said from "after supper" until 1 A. M. for six days in the week, this shows she is capable of taking care of him and excuses the lack of good example and care.

The usual excuse "others are doing it" is given as justification of the mother's dereliction and of the boy's. When a mother engages in the very acts which are the cause of the downfall of her son and seems to think this is respectable, it is difficult for me to see how she can be considered a fit influence to direct his moral conduct. There is no indication in the record she intends to abandon the business in which she is engaged, and one can readily see how little good influence she would have with him when she herself is actively promoting the very situation which has contributed to her son's present state. The mother says the boy "is a very good student if he wants to work." She admits he did not do very well and gives as a reason, "I suppose he was running around at the Selstrom place and was not studying; that is what he told me himself."

The record hows definitely that arrangements had been made permitting him to enlist in the Merchant Marine. He has a brother in the Navy. In the record is the statement of his counsel that if the boy joined the Merchant Marine "he will receive

four years of instruction and training which will train him for life if he wishes to stay in the Navy."

It does not appear the juvenile court gave any consideration to this possibility. While concurring in reversal and remand I believe it wise, before the boy is committed to the training school for the crucial years before him, to require the juvenile court to investigate this contingency, and make further efforts to find a proper place for this boy so that he be away from these evil influences which surround him.