In the Interest of A. D. L., a Child.

Donald SIEFERT, Petitioner/Appellee,

v.

A. D. L., Respondent/Appellant,

A. W., E. L., Director, State Youth Authority, Superintendent, State Industrial School, Respondents.

Civ. No. 9831.

Supreme Court of North Dakota.

Jan. 23, 1981.

Thomas Tuntland, State's Atty., Mandan, for petitioner/appellee.

Benjamin C. Pulkrabek, Mandan, for respondent/appellant.

PAULSON, Justice.

A.D.L. appeals from an order issued by the Juvenile Court of Morton County on August 4, 1980, which transferred jurisdiction over A.D.L. from the Juvenile Court to the District Court of Morton County. Waiver of jurisdiction by a juvenile court is the process whereby the court relinquishes its jurisdiction over a child and transfers the case to a court of criminal jurisdiction for prosecution as in the case of an adult. We reverse.

A.D.L. was admitted to the North Dakota Industrial School at Mandan on September 12, 1978, under a placement order issued by the State Youth Authority. A.D.L. responded favorably to the treatment and counseling he received at the Industrial School and plans were made for A.D.L. to enter the Job Corps program located at Box Elder, South Dakota. When A.D.L. was released with the understanding that he participate in the Job Corps program, he, instead, returned home and, after he was apprehended, he was readmitted to the Industrial School. At 1:30 a. m. on June 22, 1980, A.D.L. and another juvenile, N.C. left the group home of the State Industrial School at Mandan. A.D.L. and N.C. obtain-

ed a package of beer from the back of a pickup truck and consumed the beer behind the Mandan Community Center. A.D.L. and N.C. then sought to obtain more beer. N.C. had been employed at the Mandan Golf Pro Shop for one week and knew that the Pro Shop sold beer. In the early morning hours of June 22, at 6:00 a. m., A.D.L. and N.C. broke a door and window at the Pro Shop and stole three cases of beer. Shortly afterward, at 6:45 a. m., Kenneth Miller, an employee at the Pro Shop, observed A.D.L. and N.C. running out of the Pro Shop carrying beer and then hiding in some bushes located near the adjacent golf course. Miller observed the broken door and window at the Pro Shop and proceeded to notify the Mandan Police Department of the burglary. A.D.L. and N.C. were apprehended at 7:30 a. m. less than an hour later, in the vicinity of the nearby Heart River by officers of the Mandan Police Department.

On July 10, 1980, Donald Siefert, a detective with the Mandan Police Department, submitted a petition to the Juvenile Court of Morton County in order to transfer jurisdiction over A.D.L. from the Juvenile Court to the District Court of Morton County. On July 31, 1980, a hearing was held on the petition and on August 4, 1980, the Juvenile Court of Morton County issued an order which transferred jurisdiction over A.D.L. to the District Court of Morton County. At the July 31, 1980, hearing, several employees of the State Industrial School testified as to the feasibility of continued treatment for A.D.L. at the Industrial School. Dr. Duane L. Lawrence, the superintendent of the North Dakota Industrial School, testified that A.D.L. had adjusted well to the environment at the Industrial School and that not all of the Industrial School's resources had been utilized in respect to A.D.L.'s treatment there. Buck Nelson, a receiving and diagnostic coordinator at the Industrial School, testified that in his opinion no course of successful treatment for A.D.L. was available at the Industrial School; however, Nelson had had no direct contact with A.D.L. for almost one year. Burton Daly, a counselor, and Harvey Gan-

gle, a group home director and counselor, both had served as counselors for A.D.L. and both testified at the hearing. It was Gangle's opinion that A.D.L. had a serious drinking problem. The staff at the Industrial School had not conducted meetings as to the prospects for further treatment of A.D.L. at the Industrial School; however, Nelson and Daly testified that in their estimation the Industrial School could provide little additional assistance to A.D.L. on the basis of existing treatment alternatives at the Industrial School. Nevertheless, both Nelson and Daly testified that not all of the School's treatment alternatives had been used in A.D.L.'s treatment.

A.D.L. raises three issues for our consideration:

1. Whether or not the juvenile court committed error when it found that A.D.L. was not treatable in an institution for the mentally retarded or mentally ill.

2. What is the burden of persuasion required at a transfer hearing when § 28-20-34(1)(b)(4), N.D.C.C., states "reasonable grounds to believe"?

3. Whether or not the juvenile court committed error when it found that A.D.L. was not amenable to treatment.

## I

The first issue concerns whether or not the juvenile court committed error when it found that A.D.L. was not treatable in an institution for the mentally retarded or mentally ill under § 27-20-34(1)(b)(4)(c), N.D.C.C., which authorizes transfer of jurisdiction where "The child is not treatable in an institution for the mentally retarded or mentally ill." Section 27-20-35, N.D.C.C., states that if the evidence presented at a juvenile dispositional hearing indicates that a child suffers from mental retardation or mental illness, the court shall commit the child for a period of not to exceed sixty days to an appropriate institution, agency, or individual for study and report on the child's mental condition before the court makes a disposition therein. At the waiver

hearing, it was established that A.D.L. was below average in intelligence, but was not retarded. A counselor for A.D.L. at the Industrial School and a group home director there, Harvey Gangle, testified that A.D.L. had a problem with alcohol. A.D.L. had been evaluated at the Memorial Mental Health Center in Mandan and he was diagnosed as having an alcohol problem. A.D.L. contends that the juvenile court should have either required a copy of the report from the Mental Health Center or committed A.D.L. for a period of not to exceed sixty days to an appropriate institution, agency, or individual for study and report in order to inform the court of A.D.L.'s condition. In addition, A.D.L. contends that the juvenile court would be required to make a determination as to whether or not A.D.L. is committable under § 27-20-35, N.D.C.C.; and also whether A.D.L. is treatable for a mental illness under § 27-20-34, N.D.C.C. Because the requirements were not met, A.D.L. asserts that the waiver of jurisdiction order issued by the juvenile court is invalid.

The premise upon which A.D.L. bases his contentions is that his alcohol problem can be equated to a mental illness. This premise is fundamentally incorrect. Chapter 27-20, N.D.C.C., does not contain a definition of the term "mentally ill". However, § 25-03.1-02(10), N.D.C.C., provides:

"*25-03.1-02. Definitions.* In this chapter, unless the context or subject matter requires otherwise:

· · · · ·

"10. 'Mentally ill person' means an individual with an organic, mental, or emotional disorder which substantially impairs the capacity to use self-control, judgment, and discretion in the conduct of personal affairs and social relations. 'Mentally ill person' does not include a mentally retarded or mentally deficient person of significantly subaverage general intellectual functioning which originates during the developmental period and is associated with impairment in adaptive behavior. Drug addiction and

alcoholism do not per se constitute mental illness, although persons suffering from these conditions may also be suffering from mental illness."

This definition is contained in Chapter 25–03.1, N.D.C.C., which deals with commitment procedures. Under the definition of the term "mentally ill person", alcoholism does not per se constitute mental illness. We believe that this definition applies to § 27–20–34, N.D.C.C., which does not define the term "mental illness". Thus, A.D.L. does not come within the provisions of § 27–20–34(1)(b)(4)(c), N.D.C.C., and the waiver of jurisdiction order issued by the district court was proper in this respect. *See In Interest of K. G.,* 295 N.W.2d 323 (N.D.1980). *See also C. H. v. State,* 148 Ga.App. 609, 252 S.E.2d 22 (1979).

## II

■ The second issue raised by A.D.L. concerns what burden of persuasion the State must meet under § 27–20–34(1)(b)(4), N.D.C.C., when the court must find "reasonable grounds to believe". A.D.L. asserts that the words "reasonable grounds to believe" are capable of three varying standards of persuasion. In civil cases a mere preponderance of the evidence is necessary to sustain a burden of persuasion. In criminal cases the burden of persuasion requires the elimination of all probabilities other than guilt so that no reasonable doubt remains. In certain cases, a third and intermediary standard referred to as "clear and convincing" is used. In juvenile delinquency proceedings, proof of guilt must be shown to be proof beyond a reasonable doubt. *In Re Winship,* 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). In *Kent v. United States,* 383 U.S. 541, 86 S.Ct. 1045, 16 L.Ed.2d 84 (1966), the United States Supreme Court stated that due process requires that a juvenile is entitled to a hearing on the question of waiver sufficient in the particular circumstances to satisfy the basic requirements of due process and fairness. In addition, the Supreme Court held in *Kent, supra,* that the juvenile is entitled

to representation by counsel at the hearing; access to the juvenile's social records upon request of the juvenile's attorney; and a statement of reasons in support of the waiver order if jurisdiction is waived.

■ Section 27–20–34(1)(a) and (b), N.D.C.C., sets forth standards for waiver of juvenile court jurisdiction. The standard of "reasonable grounds" has been compared to a showing of probable cause.[1] In *Draper v. United States,* 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959), the United States Supreme Court held that the terms "probable cause" as used in the Fourth Amendment of the United States Constitution and "reasonable grounds" as used in § 140(a) of the Narcotic Control Act of 1956 (26 U.S.C. § 7607) were substantial equivalents of the same meaning. See also *Colling v. Hjelle,* 125 N.W.2d 453 (N.D.1963). Probable cause exists where the facts and circumstances within the arresting officers' knowledge and of which they had reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution in the belief than an offense has been or is being committed. *Brinegar v. United States,* 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949); *Carroll v. United States,* 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925). Thus, probable cause and reasonable grounds are equivalent terms in the sense that the juvenile court finds that there are reasonable grounds to believe that the child committed the delinquent act alleged. In this respect, the waiver or transfer of jurisdiction hearing operates much like a preliminary hearing which requires a finding of probable cause.

■ However, a waiver of jurisdiction hearing is much more a determination of whether or not probable cause—"reasonable grounds"—exist that the child committed the delinquent act alleged. In addition, the juvenile court must make the findings required under § 27–20–34(1)(b)(4)(b), (c), and (d), N.D.C.C. The State bears the burden of persuasion on these issues and the standard of persuasion varies from jurisdiction

---

1. Samual M. Davis, *Rights-of-Juveniles*; The Juvenile Justice System (2d ed. 1980).

to jurisdiction. Examples vary from placing the burden of persuasion on the juvenile [2] to the standard of persuasion referred to as clear and convincing.[3] Thus, the standard of proof denominated as proof beyond a reasonable doubt is inapplicable to waiver of jurisdiction proceedings because it applies in the context of a criminal trial and not to the initial stages of the criminal process.

Most courts which have considered this issue have adopted the preponderance of the evidence standard of persuasion. *See, e. g., In the Matter of F. S.*, 586 P.2d 607 (Alaska 1978); *In re Lerma*, 29 Or.App. 713, 564 P.2d 1100 (1977); *In re Appeal No. 646(76) From Cir. Ct., Etc.*, 35 Md.App. 94, 369 A.2d 150 (1977); *Imel v. State*, 168 Ind.App. 384, 342 N.E.2d 897 (1976); *State v. Layne*, 546 S.W.2d 220 (Tenn.App. 1976); *In re P. B. C.*, 538 S.W.2d 448 (Tex.Civ.App.1976); *In re Miles*, 269 Md. 649, 309 A.2d 289 (1973). We do not accept the conclusion reached by these courts because § 27–20–34(1)(b)(4), N.D. C.C., specifies a "reasonable grounds to believe" standard which we have equated to a probable cause determination. In addition, we believe that the matter is more appropriately addressed by the legislature.

### III

■ The final issue raised by A.D.L. concerns whether or not the juvenile court committed error when it found that A.D.L. was not amenable to treatment or rehabilitation as a juvenile under § 27–20–34(1)(b)(4)(b), N.D.C.C. In proceedings under Chapter 27–20, N.D.C.C., findings of fact are reviewable without reference to the "clearly erroneous" standard of Rule 52(a), N.D.R.Civ.P. The Supreme Court may conduct what is in effect a trial de novo; however, the findings of fact of the trial court are entitled to appreciable weight. *In Interest of E. B.*, 287 N.W.2d 462 (N.D.1980); *In Interest of K. P.*, 267 N.W.2d 1 (N.D.1978). In its order transferring jurisdiction over A.D.L. to the district court of Morton County, the juvenile court stated in paragraph 3 of the findings, in pertinent part:

"While at the group home, . . . [A.D.L.] committed the Burglary in question. There are no substantially different courses of treatment available at the North Dakota State Industrial School. The course of treatment provided by the Industrial School has not succeeded in the past and cannot reasonably be expected to succeed in the future. No other available facility for the treatment of juveniles would have a program which could be reasonably expected to succeed. The Court therefore finds there is reasonable cause to believe that . . . [A.D.L.] is not amenable to treatment or rehabilitation as a juvenile through available facilities."

■ The testimony presented at the hearing by the employees at the Industrial School disclosed two facts. First, the superintendent of the Industrial School and A.D. L.'s various counselors agreed that not all of the available resources and courses of treatment at the Industrial School had been used in A.D.L.'s case; and, second, the testimony presented at the hearing does not support the juvenile court's finding that A.D.L. was not amenable to treatment or rehabilitation as a juvenile through available facilities.

Duane L. Lawrence, the superintendent of the Industrial School, testified that since A.D.L.'s admission to the Industrial School on September 12, 1979, and his readmission on April 4, 1980, A.D.L. had adjusted well to the environment at the Industrial School. Lawrence testified to this fact and the fact that A.D.L. was amenable to treatment at the Industrial School, as follows:

"Q [Mr. Pulkrabek] And at times, from looking at your records, when he is at the school, does he seem to be amenable to your treatment and rehabilitation there?

"A He certainly seems amenable. Whether we are actually getting any

2. See, *e. g.*, Cal.Welf. & Inst.Code § 707 (Supp. 1979).

3. Mass.Gen.Laws Ann., Ch. 119, § 61 (Supp. 1979).

treatment done, really probably only ... [A.D.L.] knows....

.    .    .    .    .

"Q Going through all those records, can you find any report in there that says, 'There's just no way we can treat him at the Industrial School'?

"A No.

.    .    .    .    .

"Q [Mr. Tuntland] Do you think you would find any such statement in the file of any child out there?

"A In some instances, yes. Some of the reports might indicate that we were not appropriate. That would be the pre-release report or why we have discharged a student, and we have indicated, if we thought the student got himself or herself in serious trouble with the law, that we would recommend they be handled in adult court...."

Buck Nelson, a receiving and diagnostic coordinator at the Industrial School, testified that in his opinion A.D.L. could be given little additional help at the Industrial School. However, Nelson had not been involved in a formal staffing of A.D.L.'s case and Nelson's involvement with A.D.L.'s case occurred at the time that A.D.L. was admitted to the Industrial School. Nelson testified as follows, in pertinent part:

"Q [Mr. Pulkrabek] And have you talked with the counselors that have worked with ... [A.D.L.] after he has left you?

"A Yeah; but more so on an informal basis. I really haven't been involved in a formal staffing or restaffing of his case.

"Q You haven't asked one of them whether or not they have anything different they might try for him? Is that a fair statement?

"A Yeah, that's true.

.    .    .    .    .

"Q [Mr. Pulkrabek] How can you gauge whether or not someone is going to be receptive to your program? How do you figure that out?

"A Well, I don't know if I can gauge beforehand....

.    .    .    .    .

"Q Yes, when someone comes back and they run through you, your program—and you know all the programs—how do you now that this one is going to be receptive and this one isn't going to be receptive. Do you know?

"A Well, I don't know, I guess I would have to really determine that on an individual basis, and, you know, I don't think that there's any clearcut way of determining that to a one hundred percent degree."

Burton Daly and Harvey Gangle, A.D.L.'s counselors at the Industrial School, also testified at the hearing. Daly testified as follows:

"Q [Mr. Pulkrabek] Mr. Daly, have you ever met with Dr. Lawrence and told him that there's nothing more you can do with ... [A.D.L.]?

"A No, I haven't.

"Q Have you ever written that on any of his reports so it would be in ... [A.D.L.'s] file?

"A No, I haven't.

"Q And as far as when he has been with you at the school, he behaved well?

"A Very good.

"Q And he appears to be advancing and being amenable to treatment; right?

"A He appears that way."

The counselor having the most recent experience with A.D.L. was Harvey Gangle. Gangle testified as follows:

"Q [Mr. Tuntland] You are familiar with ... [A.D.L.]?

"A I have worked with him about five weeks.

"Q That was at the group home in Mandan?

"A Yes.

"Q You were a counselor there at the time; is that correct?

"A I was a group home director and a counselor.

"Q How did ... [A.D.L.] do at the group home?

"A ... [A.D.L.] appeared to do very well. He was involved in group. He had discussed the possibility of some kind of alcohol dependency. We had him evaluated at the Mental Health in Mandan. He was involved in group up there twice prior to this getting into trouble. He had a job; done very well on the job. Overall he appeared to be doing very well.

"Q And then he went out and committed a burglary?

"A That's correct.

"Q Did that surprise you?

"A In the sense that they stole beer, I guess it didn't surprise me, because in the discussions that ... [A.D.L.] and I had, I felt that he did have a problem and needed some kind of alcohol treatment.

"Q You believe that ... [A.D.L.] does have an alcohol problem?

"A I do, yes. That's my opinion based on the evaluations at Mental Health and their acceptance of him in outpatient.

.    .    .    .    .

"Q How did he get involved with alcohol at the group home?

"A He on another occasion snuck out of the house and was found by a staff member, I think, in the alley and had met some friends and had been drinking something there. And it was after that time that ... [A.D.L.] and I sat down and thought we needed to do something more than just a regular group and individual sessions, and that's when we went to Mental Health.

"Q What is it? ... [A.D.L.] just can't handle individual responsibility?

"A It would appear that way.

"Q Any chance that you can change him?

"A It's still my feeling that if he could be involved in an alcohol or drug treat-ment program, he could turn that around. He done very well on the job. I talked to his employers. They were very pleased with his work."

This testimony demonstrates that A.D.L. has a problem with alcohol which requires treatment. Under § 27–20–34(1)(b)(4)(b), N.D.C.C., the court must find that the child is not amenable to treatment or rehabilitation as a juvenile through available facilities. Section 27–20–34(1), N.D.C.C. does not provide that the nature of the offense must be taken into consideration in determining whether or not treatment and rehabilitation can be accomplished through available facilities. Nevertheless, to meet and satisfy the provisions of § 27–20–34(1), N.D.C.C., we cannot escape realities in this regard as to the nature of the offense which the child may have committed, because it constitutes a basis for determining whether or not the child is amenable to treatment or rehabilitation as a juvenile through available facilities. Experience tells us that a child committing an offense of violence requires a course of treatment different than a course of treatment accorded a child who commits a nonviolent offense. Similarly, the interests of the community and legal restraint and discipline will vary depending upon the nature of the offense.

Our review of the record discloses that A.D.L. is amenable to treatment because A.D.L. has a problem with alcohol which contributes to his deviant behavior; A.D.L.'s problem with alcohol can be treated through available facilities—whether at the Memorial Mental Health Center or at the Jamestown State Hospital; the counselor having recent contact with A.D.L. testified that A.D.L. is amenable to treatment and rehabilitation at the Industrial School; A.D.L. has responded favorably to the Industrial School environment; on each occasion when A.D.L. became involved in difficulties with the law, he was actually residing outside of the Industrial School in some type of half-way facility, apparently before he was ready for such a less structured life; and the offense involved was nonviolent

and no person was physically threatened or injured. No testimony exists in the record which indicates that A.D.L. has violent propensities; therefore, the need for restraints greater than those restraints imposed by the Industrial School setting does not exist. On the basis of these factors, we have determined that the juvenile court, in developing its findings of fact, did not take into consideration the proper factors; therefore, we do not adopt the juvenile court's findings of fact. The order of the Juvenile Court of Morton County which waived jurisdiction over A.D.L. to the District Court of Morton County is reversed and the case is remanded to the Juvenile Court of Morton County.

ERICKSTAD, C. J., and PEDERSON, VANDE WALLE and SAND, JJ., concur.