Howard V. EGAN, Jr., Petitioner
and Appellee,

v.

M. S., H. S., M. S., Respondents
and Appellants.

In the Interest of M. S., a Child.

Civ. No. 9994.

Supreme Court of North Dakota.

Oct. 5, 1981.

Charles J. Gilje, States Atty., Jamestown, argued, for petitioner and appellee.

Mackenzie, Jungroth, Mackenzie & Reisnour, Jamestown, for respondents and appellants; argued by William A. Mackenzie, Jamestown.

ERICKSTAD, Chief Justice.

M. S. appeals from an order of disposition issued by the Juvenile Court of Stutsman County on February 10, 1981, placing him under the care, custody, and control of the superintendent of the State Industrial School for a period of two years or until he attains the age of 18. This appeal is brought under Chapter 27–20, N.D.C.C., which provides that appeals may be taken from a final order, judgment, or decree of the juvenile court to this court.

On January 19, 1981, a petition was filed in the Juvenile Court of Stutsman County which alleged that M. S. was a delinquent child because he and another juvenile had committed the offense of robbery. At a hearing held on February 3, 1981, the juvenile court determined that M. S. was a delinquent child. No issue was raised on this appeal with respect to the finding of delinquency at the accusatory stage of these proceedings.

The issue raised on this appeal involves the disposition stage of the proceedings in the juvenile court. M. S. contends that his commitment to the State Industrial School was not justified by the evidence.

■ The proceedings in the juvenile court were held under the provisions of the Uniform Juvenile Court Act, Chapter 27–20, N.D.C.C. An appeal taken under that act is triable anew in this court. *In re Walter*, 172 N.W.2d 603, 604 (N.D.1969); *In the Interest of S. J.*, 304 N.W.2d 685, 686 (N.D.1981). Because our scope of review under Chapter 27–20, N.D.C.C., is equivalent to former procedure of trial de novo, we do not apply the "clearly erroneous" test of Rule 52(a) of the North Dakota Rules of Civil Procedure. *In the Interest of M. D. J.*, 285 N.W.2d 558, 559 (N.D.1979). Despite the fact that we do not apply the clearly erroneous rule, we do give appreciable weight to the findings of the juvenile court. § 27–20–56, N.D.C.C.

Two issues are presented for our consideration. The first is whether or not the juvenile court's order committing M. S. to the State Industrial School was proper. After a careful examination of the facts, we conclude that the order of disposition of the juvenile court was improper and therefore reverse and remand.

The second issue is whether or not M. S. is entitled to attorneys' fees from Stutsman County on appeal. The juvenile court, upon motion for court-appointed counsel, held that it lacked jurisdiction to hear the motion. We reverse and hold that the juvenile court continues to have jurisdiction for the limited purpose of hearing and deciding that motion.

■ The question of disposition in juvenile proceedings has been considered by this court in several cases. The test in arriving at an order of disposition of a delinquent child, stated most simply, is as follows: What are the best interests of the child and the State of North Dakota? *In re Walter*, 172 N.W.2d 603, 604–05 (N.D.1969); *In Interest of S. J.*, 304 N.W.2d 685, 686 (N.D. 1981).

Prior to the enactment of the Uniform Juvenile Court Act, this court discussed the rationale for considering the best interests of the child and state, as follows:

"Was the order committing [the delinquent child] to the State Training School for his best interests and for the best interests of the State of North Dakota? . . .

"We realize that proper disposition of cases of juvenile delinquency requires a delicate balancing of mixed considerations and that even the most careful weighing of pertinent factors can only result in conclusions that are speculative to the extent that they attempt to predict the course of future events. Confidence that a correct conclusion has been reached must of necessity rest upon hope founded in experience, rather than on certainty. We think therefore that the problem should be approached in a spirit of optimism and that drastic remedies should not be invoked where we can have

reasonable hope that lesser ones will have an equal if not a complete success.

"What then are the factors to be considered and what relative weight is to be given to each? To what extent is the welfare of an individual delinquent to be counterbalanced by the good of the state? In one sense, a decision, which will help quiet public indignation over a scandalous condition which has arisen in a community, or which, because of its severity, will act as a forbidding example to other youngsters, may be said to be for the good of the state. But we do not think that, as used in the juvenile act, the phrase can be given such a broad interpretation. Considerations of expediency, the satisfaction of public indignation, or example are contrary to the whole spirit of the juvenile act. They are dependent on publicity to be effective for any purpose and all proceedings in juvenile court are declared by statute to be "confidential". Section 27–1606, R.C. 1943. We therefore hold that the good of the State requires a child to be removed from a community only when his delinquency is such that he has become a danger to society either because of his own conduct or his influence upon others." *State v. Myers*, 74 N.D. 297, 22 N.W.2d 199, 201 (1946).

That rationale and test prevailed through 1969 when the Uniform Juvenile Court Act was adopted by the North Dakota State Legislature. *In re Walter*, 172 N.W.2d 603, 604–05 (1969). The purposes of the Uniform Act as described in Section 27–20–01, N.D.C.C., are in harmony with the rationale found in previous opinions of this court:

"*27–20–01.      Interpretation.*—This chapter shall be construed to effectuate the following public purposes:

1. To provide for the care, protection, and wholesome moral, mental, and physical development of children coming within its provisions;

2. Consistent with the protection of the public interest, to remove from children committing delinquent acts the taint of criminality and the conse-

quences of criminal behavior and to substitute therefor a program of treatment, training and rehabilitation;

3. To achieve the foregoing purposes *in a family environment* whenever possible, separating the child from his parents only when necessary for his welfare or in the interest of public safety;" (Emphasis added.)

The test remains: What are the best interests of the child and the State? *In Interest of S. J.*, 304 N.W.2d 685, 686 (1981).

In the instant case, then, we have reviewed the evidence proffered at the dispositional hearing and considered the best interests of the child and the state with a view to achieving those interests in a family environment.

The juvenile court expressed its opinion that M. S. should receive counseling outside his home as follows:

"The picture I get of [M. S.] is that he has the capacity to learn. He knows that there are consequences that must be met. . . . However, I also feel that [M. S.] is a person who can learn by his mistakes; he has the capacity; he has got to learn that no one should be allowed to get by with these things. I think, in [M. S.'s] case, he is going to be the better person for it. . . . But just merely talking to him and counselling is not, in the Court's opinion, indicated in this case. This is a serious matter. [M. S.] and everyone has got to learn that they cannot take matters into their own hands. They cannot use violence on the person of another.

"It will be the judgment of the Court that [M. S.] be sent to the Industrial School at Mandan."

In light of the evidence submitted in this case we disagree with the juvenile court in its opinion that M. S.'s best interests will be served by commitment to the State Industrial School. At the juvenile hearing M. S.'s parents, pastor, high school principal, current employer, and a previous employer all testified on M. S.'s behalf.

The testimony at the hearing was similar to that in the case of *In re Walter*, 172 N.W.2d 603 (N.D.1969).

*Walter* involved two boys who were adjudged delinquent as a result of having committed grand larceny. The testimony in that case revealed that neither boy had been in trouble before except that one of the boys had received a traffic ticket for riding as a passenger on a motorcycle without a helmet; both were good students at the high school and both intended to attend college after high school. Both pastors testified that the boys were from good families, and expressed their willingness to sponsor the youths if probation were granted and assist in their rehabilitation in every way possible. The family situation in both cases indicated that the boys had not been a discipline problem for their parents. There was no evidence that either of the boys needed treatment or rehabilitation other than that which he could receive in the family home. Additionally, both the state's attorney and the juvenile commissioner in *Walter* made written recommendations that the boys be placed on probation. In view of the favorable testimony and the recommendations of the state's attorney and juvenile commissioner, this court held that the juvenile court's decision to commit the boys to the State Industrial School was contrary to the philosophy of the law.

There are many parallels between the facts of *Walter* and the facts of this case. Six witnesses were called on behalf of M. S. at the dispositional hearing. Mr. Gordon Olson, principal of the Jamestown Junior High School for the past 12 years and a teacher in the Jamestown public school system for 20 years, testified that he was acquainted with M. S. and never had to discipline M. S. while he was in junior high school. He stated that M. S. never posed a discipline problem. Olson also had possession of a transcript of M. S.'s grades. A review of the transcript shows that M. S. was an above average student from 1978 through 1980 and that he had achieved good conduct grades.

The Reverend Richard Hutton, senior pastor of the church which M. S. attends,

testified that M. S. was in his confirmation class for a period of 36 weeks. He said that M. S. was a student who behaved, who came to class prepared and ready to participate. The Reverend Hutton stated that he believed that M. S. was well adjusted, and was more mature than the vast majority of students in his class room. He testified that M. S. was an asset to the community and that he believed M. S. could benefit from counselling available in M. S.'s home town.

M. S.'s employer stated that M. S. was prompt getting to work, never missed work, got along well with the other employees and that there had never been any allegations or hints that money was missing due to M. S.'s access to the cash register.

A former employer of M. S. testified that she and her husband were in charge of the distribution of a newspaper. She stated that she was acquainted with M. S. by virtue of his previous employment as a newspaper carrier. She said that she had received only one phone call regarding a late delivery by M. S. during a period of five years when M. S. delivered newspapers. She further stated that M. S. received an award as an outstanding carrier in the city during one year of his tenure with the newspaper.

M. S.'s parents testified that they had raised seven children and that all of the older children "finished high school." They testified that although there had been minor problems they had had no serious problems with any of the children.

The favorable testimony from M. S.'s pastor, the fact that he is a good student, and the fact that his family situation is good makes this case analogous to *Walter*.

An additional similarity between *Walter* and the instant case developed during the oral argument in our court when the state's attorney was questioned about a statement in the transcript made by the juvenile court during the dispositional hearing. The juvenile court, in its oral findings, stated that, "[The state's attorney] and I don't agree." In response to questioning during oral argument relative to the meaning of that comment, the state's attorney responded that he had either agreed with the recommendations made by M. S.'s attorney or that he recommended on his own that M. S. be placed on probation and allowed to remain with his family. Though he was uncertain about the precise form in which his recommendation was made, the state's attorney was certain that the substance of his recommendation was that M. S. not be placed in the State Industrial School.

The juvenile supervisor recommended that M. S. be committed to the custody of the North Dakota State Youth Authority. He said: "[M. S.] has a good attendance record in school. He has only missed one day and hasn't been tardy. His grades have been in the high average range and he has not been a disciplinary problem to school officials. [M. S.] has had one contact with the police prior to the present charge of robbery. It is recommended that he be committed to the custody of the North Dakota State Youth Authority for a period of two years."

The State Youth Authority, upon receiving custody of a child, under Chapter 27–21, N.D.C.C., is directed to process the child through such diagnostic testing and evaluation programs as may be necessary to determine his disposition in his best interest and in the best interest of the state. After completing the diagnostic testing and evaluation program, the State Youth Authority has available to it a number of options including the power to place him in the custody of his parents, other suitable guardian, a vocational training institution, or the State Industrial School.[1]

---

1. The State Youth Authority creation and powers are provided for in Sections 27–21–01 and 27–21–02, N.D.C.C., as follows:

     "*27–21–01. Creation of state youth authority—Director.* A state youth authority is hereby created and established with such powers and duties as are prescribed by this chapter. The state youth authority shall be created within the social service board, and its chief administrative officer shall be the executive director of the social service board, or his designee."

The facts of this case, then, are similar to the facts of *Walter*. Not only is the testimony similar, but in both cases the state's attorney recommended probation rather than commitment to the State Industrial School. In *Walter* the juvenile commissioner strongly recommended probation, and the juvenile supervisor in this case, recommended, at a minimum, additional evaluation before committing M. S. to the State Industrial School.

In *Walter*, we said:

"We think it is clear from the record that the lower court has failed to follow the guidelines set out in previous decisions by this court, *supra*. Recommendations for probation were made by the State's Attorney, the Juvenile Commissioner, and the two ministers. No one at the hearing recommended confinement in the Industrial School." 172 N.W.2d at 606.

■ Similarly, in this case, no one at the hearing recommended confinement in the State Industrial School. In reviewing the transcript and the record, it appears that the juvenile court's decision is based in part on the premise that M. S.'s commitment to the State Industrial School will help quiet public indignation. We said, in *State v. Myers*, 74 N.D. 297, 22 N.W.2d 199 (N.D. 1946), that this is not a factor to be taken into consideration in determining disposition of a juvenile case. That statement has been reaffirmed by this court since *Myers*. *In re Walter*, 172 N.W.2d 603, 606 (N.D. 1969).

A comparison of the purposes of the Uniform Juvenile Court Act with the purposes of the North Dakota Criminal Code which governs criminal conduct of adults, is helpful in illustrating the divergent philosophies in dealing with adults and juveniles.

The philosophy behind disposition of juveniles who have been adjudicated delinquent, as previously discussed, is found at Section 27–20–01, N.D.C.C. Additionally, Section 27–20–31, N.D.C.C., identifies rehabilitation as the purpose of juvenile disposition. That section provides: "If the child is found to be a delinquent child the court may make any of the following orders of disposition best suited to his treatment, rehabilitation, and welfare. . . ." § 27–20–31, N.D.C.C.

The Criminal Code governs criminal conduct of adults in North Dakota. Vindica-

"27–21–02. *State youth authority—Powers and duties.* The state youth authority shall be the administrative agency which shall take custody of delinquent and unruly children committed to its care by the juvenile courts. Upon committing a child to the custody of the state youth authority, the committing judge, the juvenile supervisor, law enforcement officers, and other public officials shall make available to the state youth authority all pertinent data in their possession with respect to the child. Upon taking custody of a child, the state youth authority shall process the child through such diagnostic testing and evaluation programs as may be necessary to determine his disposition in his best interest and in the best interest of the state. In doing so, the state youth authority may utilize the psychological, psychiatric, vocational, medical, and other diagnostic and testing services that are available, examine all the pertinent circumstances, and review the reasons for his commitment. Upon completion of the diagnostic testing and evaluation program, the state youth authority shall make disposition of the child as follows:

1. Place him in the custody of his parent, guardian, or in a foster home or suitable private institution licensed by the state for the care of children;

2. Place him in the custody of the state industrial school or in a vocational, training, or similar institution for children or young adults within this state; or

3. Place him in the custody of a vocational, training, or similar institution for children or young adults in another state in the event that adequate facilities for his treatment and rehabilitation are not available within this state and the committing judge concurs in the placement.

"Subject to the authority of the committing court and the Uniform Juvenile Court Act, the state youth authority shall retain jurisdiction of the child until he reaches the age of eighteen years, and may change placement of the child at any time it appears to be in his best interest and in the best interest of the state, except when the child is placed in the custody, temporary or otherwise, of the state industrial school, in which case, any change of placement or custody is subject to the recommendation of the superintendent of the industrial school and the approval of the director of institutions."

tion of public norms and punishment as a deterrence lead the list of objectives of the criminal code as indicated in Section 12.1–01–02, N.D.C.C.:

"[T]he provisions of this title are intended, and shall be construed, to achieve the following objectives:

1. To ensure the public safety through: a. *vindication of public norms* by the imposition of merited punishment; b. the *deterrent* influence of the penalties hereinafter provided; c. the *rehabilitation* of those convicted of violations of this title; and d. such confinement as may be necessary to prevent likely recurrence of serious criminal behavior." [Emphasis added.] § 12.1–01–02(1), N.D.C.C.

Although the juvenile court did not expressly state that its decision was based on the premise that M. S.'s commitment would vindicate a public norm, a reading of the transcript and record leaves this court with the impression that that was its reasoning. At the accusatory stage of the hearing, the juvenile court stated:

"This is just another example of going too far. It is reprehensible. It is inexcusable. It is not something that warrants turning [M. S.] over to the State Youth Authority. It does warrant turning [M. S.] over and committing [him] to the Industrial School at Mandan, which is what the Court is going to order.

\*     \*     \*     \*     \*     \*

"I don't know about the good character. . . . [M. S.] has been in some trouble before. He has a good attendance record in school. He has only missed one day and hasn't been tardy. His grades have been in the high average range. He has not been a disciplinary problem to the school officials. He has had one contact with the police prior to the present charge of robbery, possession of liquor, and was to attend alcohol classes. That was in 1979. But, he did engage in a robbery this time and I think there are limitations on how lenient you can get."

During the dispositional stage of the hearing, the juvenile court stated that there

are "consequences that must be served" and that "[M. S.] *and every one* has got to learn that they cannot take matters into their own hands." [Emphasis added.]

As we said earlier, the test is what is in the best interest of the child and the state. In *Walter* we said that the good of the state "requires a child to be removed from a community only when his delinquency is such that he has become a danger to society either because of his own conduct or his influence upon others." *In re Walter*, 172 N.W.2d at 606.

The juvenile court's attitude of vindication of a societal norm, and its intent to set an example by committing M. S. to the State Industrial School, with no expressed or implied concern for the best interest of the child, have resulted in a disregard of the intent of the Uniform Juvenile Court Act which is characterized by its confidential proceedings and its concern with the welfare of the individual delinquent. In failing to consider the best interest of the child, the juvenile court erred.

The order committing M. S. to the State Industrial School is, therefore, reversed and this case is remanded to the juvenile court of Stutsman County for the entry of an appropriate order placing the child in the custody of the State Youth Authority.

■ The second issue for this court to consider is whether or not M. S. is entitled to attorneys' fees from Stutsman County on appeal. M. S. has requested this court to award him costs and attorneys' fees on appeal.

A motion for court-appointed counsel on appeal pursuant to Section 27–20–26, N.D.C.C., was filed with the juvenile court on March 27, 1981, and was supported by an affidavit and a table of income, assets and liabilities of M. S.'s parents. The Uniform Juvenile Court Act provides that "a party is entitled to representation by legal counsel at all stages of proceedings under this chapter and, if as a needy person he is unable to employ counsel, to have the court provide counsel for him." § 27–20–26(1), N.D.C.C.

An order was signed on April 7, 1981, by the juvenile court stating that it lacked jurisdiction to rule on the motion because the motion was made after the filing of the notice of appeal to the North Dakota Supreme Court.

We hold that the juvenile court has jurisdiction for the limited purpose of deciding. whether or not the juvenile is entitled to the appointment of legal counsel at county expense for representation on appeal to this court even though a notice of appeal to this court has been filed prior to application for such an appointment. Although we could entertain such an application we prefer to leave that responsibility with the juvenile court which is in a better position to determine the facts surrounding such an application. This case is therefore remanded to the juvenile court for disposition consistent with the Uniform Juvenile Court Act and this opinion.

Reversed and remanded.

VANDE WALLE, PEDERSON and PAULSON, JJ., concur.

SAND, Justice (special concurrence and dissent).

While I concur with the principles and concepts discussed and applied in the opinion authored by Chief Justice Erickstad, I also dissent on the basis that the opinion does not give adequate consideration and weight to the nature of the "crime" and the circumstances under which it was committed. In Interest of P. W. N., 301 N.W.2d 636 (N.D.1981); Interest of A. D. L., 301 N.W.2d 380 (N.D.1981). Even though these cases involve hearings concerning the transfer to adult court, nevertheless the concept is applicable to this case. In this instance the only reference to the "crime" is that it was robbery, but little, if any, consideration or weight is given to what violence, if any, was used or if any physical injury was inflicted. Neither does the opinion discuss if the "crime" was premeditated, on the spur of the moment, or if the juvenile was conned into it, or whatever may have brought about the "crime." Merely because this is the first crime the juvenile was in-

volved in or found guilty of should not be the prevailing item in determining the disposition of the matter. For example, assume the first offense is a brutal murder, should the fact that it was the first offense be the prevailing matter in making the disposition? I think not.

In my opinion, the circumstance under which the crime was committed, as well as the nature of the crime, and the violence involved needs to be seriously considered and weighed in the disposition of the matter. In Interest of P. W. N., supra, we noted that the "nature and severity of the offense must be given some consideration at a transfer hearing." If the record is inadequate to give consideration to these items I would remand the case for further proceedings to specifically cover the nature of the crime, the circumstances under which it was committed, and the violence used or inflicted.

In my judgment these are all matters that relate directly to the welfare and best interests of the child.