GLENDA KAY S., A MINOR, APPELLANT, *v.* THE STATE OF NEVADA, RESPONDENT.

No. 17232

February 24, 1987        732 P.2d 1356

*Robert Bork,* State Public Defender, *Michael K. Powell,* Chief Appellate Deputy Public Defender, Carson City, *Kay Ellen Armstrong,* Deputy Public Defender, Humboldt County, for Appellant.

*Brian McKay,* Attorney General, Carson City; *Jack Bullock,* District Attorney, *Wilbur H. Sprinkle,* Deputy District Attorney, Humboldt County, for Respondent.

## OPINION

By the Court, SPRINGER, J.:

At issue in the appeal is whether the juvenile division of the district court abused its discretion in committing to the girls' training center a thirteen-year-old girl who had struck a schoolmate. We reverse the commitment order and declare standards to be followed in ordering delinquent children committed to state training centers.

Glenda had been involved in an ongoing quarrel with a schoolmate at Winnemucca Junior High School. On February 11, 1985, she struck the girl. There is nothing in the record to indicate that the other girl was injured or that this was a serious or aggravated battery. On February 12, 1985, Glenda was arrested and locked up. Inexplicably, she was kept in detention from that day until March 10, the date on which the district judge pronounced "sentence" to the Nevada Girls' Training Center "for a period of one year." The order of commitment was signed March 11, 1985. The total period of detention in Humboldt County together with confinement in the training center cannot be determined from the record now before us.

The petition charging the battery at school was filed on February 20, 1985, and on February 24, 1985 Glenda formally admitted in open court to having committed the delinquent act of battery. The child was never formally adjudicated to be a delinquent child.[1]

On March 10, 1985, a dispositional hearing was conducted in the juvenile division. No testimony or other evidence was taken at this hearing, and the court gave no reasons or grounds for incarcerating Glenda. The court's dispositional decision must necessarily rest entirely upon the report and recommendation of the juvenile probation department as that is all that was before the court at the dispositional hearing. The juvenile authorities recom-

---

[1]Since Glenda is not an adjudicated delinquent, she cannot have been legally committed to the Girls' Training Center. A Minor v. Juvenile Division, 97 Nev. 281, 630 P.2d 245 (1981). Nevertheless, we go on to consider other aspects of the commitment order.

mended that Glenda be placed on probation and be given counseling.

From the juvenile probation report we learn that Glenda was, at the time of the school *contretemps,* thirteen years and seven months old. The girl was residing with her natural mother, a nurse, and her father, a railroad employee. According to the reporting officer, Glenda had a "close relationship" with her mother. Glenda confirms this and told the probation officer that she had a lovely home and a caring family.

Glenda has no record of adjudicated delinquency but had once been "referred" to juvenile officials for a petit larceny. Glenda's problems stem entirely, it seems, from her school situation. The probation report lists a number of "continuing" disciplinary problems noted by the school principal. Glenda's grades range from "A" in Mathematics to "D" in Social Studies.

The report indicates that during her four weeks' detention awaiting the dispositional hearing, Glenda did not at first respond well to being locked up but that later there was a "marked improvement in Glenda's overall behavior." It appears from the report that Glenda was "putting forth effort to do better." Glenda told the probation officer: "All I wish to do is go home and start all over again, and I do believe I can because I have faith in myself."

At the dispositional hearing Glenda's counsel offered a counseling program through Glenda's church and agreed with the recommendation of the probation officer that probation and counseling comprised an appropriate dispositional program. Glenda said nothing. The district attorney agreed with Glenda's attorney and the probation department's recommendation of probation and counseling.

Without stating any reasons for his decision to incarcerate the girl (other than, I did what I thought was right, and if you don't like my decision, appeal me."), the judge announced from the bench: "I'm going to sentence you to the Nevada Girls' Training Center for a period of one year."[2]

The Nevada Girls' Training Center is a place of involuntary confinement and punitive incarceration. *See* A Minor v. Juvenile

[2]The "sentence" for one year was inappropriate. Proceedings in juvenile court are "not criminal in nature." NRS 62.193. It is only in the adult system that the court shall "sentence the defendant to imprisonment for a definite period of time." NRS 176.033. The juvenile court act authorizes the juvenile court to "*[c]ommit* the child to the custody . . . of a public institution." NRS 62.211 (emphasis supplied). There is no provision for committing a child for a one-year term. Children committed to the girls' center are released by the superintendent of the school by agreement with the chief of the youth parole bureau. NRS 210.670.

Division, 97 Nev. 281, 288, 630 P.2d 245, 249 (1981). It has been pointed out by the United States Supreme Court that it is "of no constitutional consequence—and of limited practical meaning—that the institution to which [a child] is committed is called an Industrial School. The fact of the matter is that, however euphemistic the title, a 'receiving home' or an 'industrial school' for juveniles is an institution of confinement in which the child is incarcerated for a greater or lesser time." In re Gault, 387 U.S. 1, 27 (1967). The Supreme Court in *Gault* goes on to describe the world of the child committed to these schools as one of "regimented routine" and "institutional hours." "Instead of mother and father and sisters and brothers and friends and classmates, [her] world is peopled by guards, custodians, state employees and 'delinquents'. . . ." *Id.* The question is whether, under the circumstances of this case, the trial judge abused his discretion in committing Glenda to this type of an institution.

The stated purpose of the Juvenile Court Act in Nevada is that each child coming before the court should receive "such care, guidance and control, *preferably in his own home,* as will be conducive to the child's welfare and the best interests of the state." NRS 62.031(1) (emphasis supplied).

The preferred or presumed disposition, then, must be placement in the child's home unless it appears to the juvenile division that continued home residence would not be conducive to the child's welfare or the best interest of the state. Put another way, the preference for home placement must be honored absent some showing that the juvenile's remaining in the home environment is contrary to the child's welfare or the state's interest in peace and good order. There is no such showing here.

It is difficult to imagine any reason why taking Glenda away from her "lovely home and caring family" could serve the child's welfare. It is almost as difficult to imagine how the interest of the state could be served by committing this child to a training center.

There are times, of course, when a juvenile delinquent's best interests mandate placement in a controlled setting. When a delinquent has shown himself or herself to be beyond parental or other adult control and beyond the control of the court, it may become necessary, when all other measures fail, to put the delinquent in a training center. Such instances are rare and caution should be exercised that the "child's welfare" not be used as a rationalization for transporting juvenile nuisances from their homes and communities. "Certainly one instance of a child failing to follow some Rhadamanthine ruling of a [juvenile] court

does not justify instant removal to an industrial school, but a consistent course of noncooperation, particularly when combined with a predilection to commit dangerous or destructive acts does justify the court in resorting to commitment." State ex rel. D.D.H. v. Dostert, 269 S.E.2d 401, 414, (W.Va. 1980).

It is difficult to argue on the record before us that the welfare of Glenda, a girl who has never been adjudicated a delinquent and has never been on juvenile probation, would be served in any way better than that recommended by her probation officer, namely, probationary supervision and counseling while she continues to live with her parents at home.

This, obviously, is not a case in which the "best interest of the state" requires punitive incarceration.

The state's interest and purpose in enacting laws relating to juvenile delinquency is well put in the IJA-ABA Juvenile Justice Standards, Standards Relating to Disposition.[3] Standard 1.1 states that the

> purpose of the juvenile correctional system is to reduce juvenile crime by maintaining the integrity of the substantive law proscribing certain behavior and by developing individual responsibility for lawful behavior. This purpose should be pursued through means that are fair and just, that recognize the unique characteristics and needs of juveniles, and that give juveniles access to opportunities for personal and social growth.

The "integrity" of the criminal law is maintained by seeing to it that those who commit crimes are punished. This proposition necessarily applies to young as well as to older criminals. Punitive incarceration in training centers may be justified in the case of the more serious or repetitive offender because the offender *deserves* the punishment or because it is necessary for commonly accepted utilitarian reasons of deterrence or incapacitation.

The state's interest is further served by training school commitment where the "unique characteristics and needs of juveniles" can be recognized and served, and juveniles can be given "access to opportunities for personal and social growth."

Glenda, at worst a misdemeanant, does not deserve long-term incarceration. It would be unreasonable to think that it is in the

---

[3]IJA-ABA Juvenile Justice Standards is a publication of the Joint Commission on Juvenile Justice Standards, which was appointed by the American Bar Association (Copyright, 1977, Ballinger Publishing Company). After eight years of study, seventeen volumes covering the entire spectrum of the juvenile justice system were approved by the ABA in 1979. The IJA-ABA Standards have in many respects become guideposts to the future of juvenile law for legislators, judges, administrators, and agencies concerned with the juvenile justice system.

public interest to incarcerate thirteen-year-olds in order to deter them or others from committing offenses of this nature.

It was an abuse of judicial discretion for the juvenile division to order Glenda committed to the training center.

As noted, the juvenile court judge made no mention of his reasons for incarcerating Glenda. One cannot help but think that had he attempted to articulate reasons for his decision, the judge might very well have eschewed the training school commitment and followed the recommendation of his probation officer.

There are a number of reasons favoring a requirement that juvenile court judges state reasons on the record for a decision to incarcerate. Doing so provides an objective focus to the dispositional judge's thinking; it promotes a perception of fairness in the proceedings; it enables the delinquent to understand the basis of the court's action; and it facilitates the review process.

IJA-ABA Juvenile Justice Standards, Standards Relating to Dispositional Procedures, Standard 7.1A requires that the judge should "state for the record, in the presence of the juvenile, the reasons for selecting the particular disposition." Such a statement is particularly advisable when the disposition involves deprivation of liberty or other coercive intervention.

We now hold that in all cases wherein disposition includes an order of commitment of any delinquent child to one of the training centers or comparable institutions, the judge of the juvenile division must state on the record, in the presence of the juvenile, the reasons for selecting such a disposition and must state in particular why the disposition serves the welfare of the child or the interests of the state, or both.

Strong support for this holding can be found in Kent v. United States, 383 U.S. 541, 561 (1966), in which the United States Supreme Court held that a District of Columbia juvenile court, in making the dispositional decision to transfer a minor from juvenile to adult jurisdiction, must place on the record the reasons for such a decision. Deciding to incarcerate a juvenile in a training center is of comparable weight and consequence to that of the transfer decision; and, the subject juvenile is equally entitled to be given a statement of reasons in either case.

After hearing her daughter's sentence, Glenda's mother remarked that a year's incarceration was too severe a penalty for the kind of minor altercation that occurred at school.[4] Our review

---

[4]The mother may well have viewed her daughter's four weeks' imprisonment in a juvenile detention center as ample punishment for her misdeed. There is nothing in this record which shows justification for the period of pre-commitment detention, but this has not been raised on appeal.

of the record reveals no basis for supporting the juvenile division's decision to incarcerate this girl for a year or for any other term in the Girls' Training Center. No one on behalf of the state urged or even suggested that Glenda be committed to the training center. On the record, the only conceivable precipitating event for the sentence occurred when the child smiled in the courtroom.[5] There is simply no reason to believe that the counseling and probation supervision in the child's home, as recommended by the probation officer, would not serve the child and society in the best possible manner.

The order of commitment is reversed, and this matter is remanded to the juvenile division for further proceedings.

GUNDERSON, C. J., and STEFFEN, YOUNG and MOWBRAY, JJ., concur.

---

[5]During the dispositional hearing the judge said: "Take that smile off your face. This isn't fun. If you think this is a joke, young lady, you forget it." While the judge may have been justifiably concerned over what he perceived to be a flippant attitude on the part of the child, such concern does not constitute a valid basis for the penalty imposed.