In the Matter of the WELFARE OF
C.A.W., Child (C0–98–96),

and

In the Matter of the WELFARE OF
L.R.M.B., Child (C2–98–97).

Nos. C0–98–96, C2–98–97.

Court of Appeals of Minnesota.

June 16, 1998.

Fred T. Friedman, Chief Public Defender, Camille V. Doran, Assistant Public Defender, Duluth, for appellants C.A.W. and L.R.M.B.

Hubert H. Humphrey III, Attorney General, St. Paul; and Alan L. Mitchell, St. Louis County Attorney, Leslie E. Beiers, Charles P. Schumacher, Assistant County Attorneys, Duluth, for respondent St. Louis County.

Considered and decided by CRIPPEN, P.J., and DAVIES and HARTEN, JJ.

## OPINION

CRIPPEN, Judge.

Both these appeals, brought to this court on the same day and subsequently consolidated for review, are premised on the contention that the St. Louis County juvenile court ordered 21–day out-of-home correctional placements without adequate evidence or findings of fact. The appeals having merit, we reverse the disposition in each proceeding.

## FACTS

In separate cases, by orders respectively on December 16 and December 17, 1997, different trial court judges transferred custody of C.A.W. and L.R.M.B. for 21–day residential placements at an institution identified as Chisholm House. These dispositions followed adjudications that each juvenile girl, while age 15, committed separate acts of delinquency.

C.A.W., who admitted a gross-misdemeanor-level act of receiving stolen property in September 1997, had been in the company of a friend who took a purse and cashed checks in the purse to get approximately $225 in cash. C.A.W. admitted using some of this money to buy "a bunch of little things," including a pair of earrings. She also admit-

ted having some pizza and pop that her friend bought with part of the stolen money. A police report stated that she also smoked marijuana purchased by the friend.

L.R.M.B. admitted a misdemeanor-level assault of another girl in August 1997. In court, the juvenile admitted having slapped the face of the other girl and "punching her in the back." A police report in the record indicates that there were three or four punches in the back.

Neither juvenile had a record of prior delinquencies. Each previously had committed a single juvenile petty offense for possessing or using a tobacco product. Both had evidently been adjudicated in child protection proceedings on truancy reports.

The records in these cases include very little evidence on the social circumstances of either child. Recommendations of probation officers were orally stated to the court. As to each child, the record provides the following information:

a. Referring to a report on supervision of C.A.W. during the pendency of the case, a probation officer noted that she had "minimally met their expectations, meaning that she basically has been truanting from school." The officer added that supervision staff "is not recommending any further involvement at this time." Noting earlier child protection proceedings, the officer reported that the child "did not complete" a day treatment program.[1] The attorney for C.A.W. reported to the court that "the family has been working with Social Services," including involvement of the child in day treatment, and that the court had succeeded in arranging for her return to school. Urging that the Chisholm House placement be ordered but stayed, her attorney noted that C.A.W. had been cooperative with police.

b. A probation officer reported that L.R.M.B. had been in day treatment and was discharged after "she wasn't making any more progress." Social service personnel reported that the juvenile had been a victim of a sexual assault, had begun attending "the ALC Program" (not otherwise described in

---

1. There is no additional evidence in the record to permit or explain a trial court finding that

C.A.W. was "discharged" from day treatment due to misconduct and failure to attend.

the record), and that "[t]here's a lot of help that this young lady still needs in her life." The same observer noted that the juvenile had begun to understand the seriousness of her behavior. L.R.M.B. stated to the court, "I don't want to be taken away from my mom. She's the most important thing in my life and I don't want to be taken away from her."

In C.A.W.'s proceedings, the Chisholm House program was not described. In the other case, a probation officer characterized it as a "consequence program where they work," using a "positive peer culture" as a "treatment modality."

On these separate records, the trial court in each case ordered transfer of child custody for a 21–day placement at Chisholm House, plus probationary supervision for six months, on conditions including an apology to each victim. A restitution condition was added for C.A.W., and L.R.M.B. was not to have contact with the victim of her assault.

Different juvenile court judges in each case found that placement at Chisholm House

> has the advantage of providing a consequence substantial enough to impress upon the respondent the seriousness of what she has done, a trained staff to provide the respondent with insight into the causes and nature of her behavior, and * * * insights from the Chisholm House staff into any problems that the respondent might be having requiring any further intervention or support. A regular daytime community service program would not provide these needs. (The finding in L.R.M.B. also credited the program with "an intensive educational program.")

Each trial court order added findings that reasonable efforts have been made to prevent or eliminate the need for the removal of the respondent and to make it possible for the respondent to remain at home; that it is in the best interests of the respondent and the community that the re-

spondent be placed outside the home for the purpose of meeting her treatment needs.

More personal to the juveniles, the trial court noted that (a) C.A.W. had been discharged from day treatment,[2] and (b) the public social services agency "is involved with the family (of L.R.M.B.) and is exploring placement options outside the parental home due to allegations of sexual assault perpetrated on the respondent."

Finally, each trial court order of placement ended with the following observation:

> While awaiting placement for this purpose the Court will make a separate determination as to whether a supervised placement in the home would be feasible.

## ISSUE

Do the records in these cases include evidence or findings sufficient for a corrections placement?

## ANALYSIS

These cases require that we revisit the issue of findings needed under state law for 21–day correctional placements in St. Louis County cases. *See Matter of Welfare of M.A.C.*, 455 N.W.2d 494, 499 (Minn.App. 1990) (reversing St. Louis County disposition due to the absence of findings mandated by statute).

■ We note, initially, as was true in *M.A.C.*, that the challenged 21–day residential confinement orders have already been executed. Absent a dispositional stay, placements like these will always be served before review is completed. We review the dispositions, which are "capable of repetition while evading review," so that parties are not unjustly discouraged from seeking appellate relief, and so that we do not unjustly encourage erroneous trial court processes. *Id.* at 496.

■ By statute, similar in this respect to statutes in a number of other states[3], juve-

2. *See* note 1.

3. *See Model Juv. Ct. Act* § 31, 9A U.L.A. 48 (1968) (prescription of disposition "best suited to [a child's] treatment, rehabilitation, and wel-

fare"); *see, e.g.,* N.D. Cent.Code § 27–20–31 (Supp.1997) (permitting court to make disposition "best suited to the child's treatment, rehabilitation, and welfare"); *see also* Ark.Code Ann. § 9–27–330(a) (Michie 1997) (stating alternatives

nile court delinquency dispositions in Minnesota are lawful only when determined "necessary to the rehabilitation of the child." Minn.Stat. § 260.185, subd. 1 (1996). Alternatively stated, the legislature established a diminished culpability for adolescent offenders who are the object of a juvenile court disposition. Because the choice of disposition must be driven by rehabilitative needs, neither retribution nor deterrence of others lawfully constitutes adequate cause for the content of a disposition.[4]

Ratifying its specific declaration on the substantive law of juvenile court dispositions, the legislature has declared its purpose, under the Juvenile Court Act, that the courts only employ means that (a) "are fair and just," (b) "recognize the unique characteristics and needs of children," and (c) "give children access to opportunities for personal and social growth." Minn.Stat. § 260.011, subd. 2(c) (1996). So limited in their pursuits, the juvenile courts are chartered by the legislature to promote public safety and reduce juvenile delinquency by "maintaining the integrity" of proscriptive law and "developing individual responsibility for lawful behavior."[5] *Id.; see IJA–ABA Juvenile Justice Standards: Dispositions* § 1.1 (1979) (stating dispositional purpose of juvenile court in identical form subsequently enacted by the Minnesota legislature); *see also Glenda Kay S. v. State,* 103 Nev. 53, 732 P.2d 1356, 1359 (1987) (finding "well put" this declaration of the state's interest and purpose in juvenile justice laws).

The legislature has stated a mandate for certain trial court findings to show application of the legal standard for dispositions, and the requirement for findings is restated in supreme court rules that govern the procedure and substance of juvenile court dispositions. Minn. R. Juv. P. 15. *See id.* 15.05, subd. 2 (stating dispositional considerations and the trial court findings of fact that must be stated to explain a juvenile court disposition). These requirements for findings serve principally to eliminate pretext in the suggestion that a disposition is designed for the child's rehabilitation.

■ Under the combined provisions of the juvenile code and Minn. R. Juv. P. 15.05, subd. 2(A), a juvenile court disposition that removes a child from her home must be supported by findings that address five subjects:

Why public safety is served by the disposition. Minn. R. Juv. P. 15.05, subd. 2(A)(1).

Why the best interests of the child are served by the disposition. *Id.*; Minn. Stat. § 260.185, subd. 1(i)(5)(a) (Supp. 1997).

What alternative dispositions were proposed to the court and why such recommendations were not ordered. Minn. R. Juv. P. 15.05, subd. 2(A)(2); Minn.Stat. § 260.185, subd. 1(i)(5)(b) (Supp.1997).

Why the child's present custody is unacceptable. Minn. R. Juv. P. 15.05, subd. 2(A)(3)(a) ("the reasons why public safety and the best interest of the child are not served by preserving the child's present custody"); *see In re Welfare of L.K.W.,* 372 N.W.2d 392, 399–400 (Minn. App.1985) (reviewing preference under Minnesota law against removal of child from present custody).

---

for "dispositions based upon the best interest of the juvenile").

**4.** The quest for rehabilitation, says the supreme court of a neighboring state, gives the juvenile court a function "approached in a spirit of optimism" and undertaken with a duty to employ the least drastic remedy that the court might reasonably hope would succeed. *State v. Myers,* 74 N.D. 297, 22 N.W.2d 199, 201 (1946) (reversing placement of delinquent juvenile); *see Egan v. M.S.,* 310 N.W.2d 719, 721 (N.D.1981) (reversing placement; reiterating standard enunciated in *Myers* for purposes of Uniform Juvenile Code Act).

**5.** As such, contrary to imprecise comments on the concept of rehabilitation, neither the statute nor the rule directing its implementation prohibits a rational, punitive disposition, one where the record shows that correction or rehabilitation of the child reasonably cannot be achieved without a penalty. Such a record avoids the prospect of a choice to punish that is made to fulfill private or public desires for retribution or deterrence of others. *See* Maynard E. Pirsig, *Juvenile Delinquency and Crime: Legislative Achievements in Minnesota in 1959,* 44 Minn. L.Rev. 363, 383, 405 (1959) (in general, characterizing rehabilitation as the antithesis of punishment).

How the correctional placement meets the child's needs. Minn. R. Juv. P. 15.05, subd. 2(A)(3)(b) ("suitability of the placement, taking into account the program of the placement facility and assessment of the child's actual needs").[6]

### Public safety.

In each proceeding, the trial court recited and the record shows characteristics of the juvenile's current offense. Similarly, the record supports the trial court's recitation of a prior smoking offense of C.A.W. and the prior child protection adjudication (truancy) of L.R.M.D. (The trial court orders do not mention information in the record on earlier truancy of C.A.W. or a tobacco-possession act of L.R.M.D.) While minimal, these findings, duly supported by evidence, reflect the court's lawful respect for interests of public safety. *See* Minn. R. Juv. P. 15.05, subd. (B)(1)(a) (stating four public safety considerations).

But the findings on the juveniles' offense and record, by themselves, do not show a lawful disposition because they do not completely respond to the standard of Minn.Stat. § 260.185, subd. 1, confining choices to those needed for the child's rehabilitation, or to the requirements for findings that conform to that standard.

### Best interests.

Each trial court order generally states that the Chisholm House placement is in the child's best interests. If these findings were accompanied by other necessary findings, the recitation of the best-interests factor might suffice. But in these cases, the bare findings are symptomatic of other shortcomings. In neither case was the juvenile court given necessary evidence on the personal circumstances of the child and her parents. All we know about C.A.W. from the record is that she cooperated with police and was working with her family on a truancy problem. These social considerations do not provide an explanation for the correctional placement. The record reflects that L.R.M.B. has been a victim of abuse, needs a great deal of help, is involved in another program, and is the current subject of a child protection investigation. These circumstances identify no interests of the child that are served by a two- or three-week incarceration in a residential facility. The trial court's bare findings on the children's best interests are not supported by evidence of record.[7]

### Alternative dispositions.

Each trial court disposition rests in part on a finding that a placement will serve better than a "regular daytime community service program" in impressing upon the children the seriousness of their conduct, giving the child insight into the causes and nature of her behavior, and identifying needs for further intervention. There is no evidence in the record of a shortcoming of community service alternatives.

In neither case did the trial court observe its response to the alternative of supervision while the child remains at home. There is no evidence or finding to explain why this supervision would not be expected to succeed in meeting correctional goals for these juveniles. As counsel argued on behalf of C.A.W., without getting a response, the effectiveness of a supervision effort could be backed by stay of a correctional placement.

In each case, the trial court orders openly acknowledge oversight on the alternative of probationary supervision without a placement, stating that the court "will make a separate determination as to whether a supervised placement in the home would be feasible." There is no record of this determination or the considerations that entered into

---

**6.** Appellants observe that the trial courts in these cases issued "form" orders, with findings and conclusions that are identical in their principal parts. Our focus here is not on the employment of order forms but on the subjects that dispositional orders must address to substantively comply with governing statutes and rules.

**7.** The trial court in each case found that removal of the child to Chisholm House had an advantage of "a consequence substantial enough to impress upon the respondent the seriousness of what she has done." If this is viewed as a "best interests" consideration, its significance begs attention to more individualized findings on alternative dispositions and the suitability of the facility for the child, topics addressed in a later part of this opinion.

**499**

it. The decision cannot be made ex parte. Minn. R. Juv. P. 15.04.

**Present custody.**

On its face, this aspect of the mandates for findings adds little to the rule that the trial court address dispositional alternatives. But the rule is a reminder of the preference for placing children in their own homes, and it calls for attention to the families of the children. C.A.W.'s dispositional record includes no information on her family. The record shows no response to L.R.M.B.'s plea for protection of her relationship with her mother. The trial court acknowledged that a child protection effort is being made for the welfare of L.R.M.B., but there was no evidence before the court on the nature of that effort, and it made no finding to indicate how a correctional placement would coincide with what is being learned and done in the child protection matter. Correctional placements cannot occur without evidence and findings reflecting consideration of the child's familial relationships.

**Suitability.**

Trial court findings, repeated in each case, credit Chisholm House with the potential to impress upon the children the seriousness of their misconduct and to gain insights for the children and those who deal with them. There is inadequate evidence to permit these findings.

The L.R.M.B. record shows that Chisholm House is a "consequence program where [children] work." This record does not reveal the consequences or the work that is involved in the program. The program uses a named treatment approach ("positive peer culture"), but the record does not indicate any evidence that this "treatment modality" is significant or effective. Slightly more problematic is the fact that the record in C.A.W. includes no information on Chisholm House. Neither record addresses the needs of the child that are expected to be met by the placement program. Pertinent to the rehabilitative nature of juvenile court dispositions, these records fail to reveal characteristics of the placement to distinguish it from secure detention.

**DECISION**

The records in these cases include inadequate findings and evidence on (a) consideration of alternatives to correctional placements; (b) the interests in protecting the placement of the children in their own home; and (c) the suitability of the Chisholm House placements. There is no evidence in the record to support the trial court findings on the best interests of the children. Under these circumstances, the correctional placement in each case must be reversed.

**Reversed.**