**In the Matter of the WELFARE OF R. V., Child.**

No. A04–2007.

Court of Appeals of Minnesota.

Aug. 23, 2005.

Leonardo Castro, Hennepin County Public Defender, Barbara S. Isaacman, Assistant Public Defender, Minneapolis, MN, for appellant.

Mike Hatch, Attorney General, St. Paul, MN; and Amy Klobuchar, Hennepin County Attorney, Donna J. Wolfson, Assistant County Attorney, Minneapolis, MN, for respondent State.

Considered and decided by HALBROOKS, Presiding Judge; LANSING, Judge; and WRIGHT, Judge.

## OPINION

WRIGHT, Judge.

Appellant, a juvenile, challenges the district court's revocation of probation and order directing out-of-home placement. Appellant argues that the district court violated his right to due process when revoking his probation and abused its discretion by ordering out-of-home placement and by failing to issue sufficient written findings in support of its disposition. We conclude that the district court did not violate appellant's due-process rights when revoking his probation, but the district court failed to make sufficient findings in support of its disposition. We, therefore, affirm the portion of the district court's order revoking appellant's probation, reverse the disposition, and remand for additional findings addressing the appropriate disposition for the violation.

## FACTS

In October 2003, appellant R.V. was adjudicated delinquent on one count of un-

lawful possession of a firearm, in violation of Minn.Stat. § 624.713, subd. 1(a) (2002). The district court placed R.V. on probation and stayed commitment to the Beta program on the condition that R.V. obey the law and attend the Hennepin County Gun Program.

In December 2003, R.V. appeared before the district court for a revocation hearing on allegations that he had failed to attend the gun program and had tested positive for marijuana. The district court found the allegations to be true. But because R.V. had spent nine days in detention, the district court reinstated his probation, ordered him to complete the gun program without missing any sessions, and placed him on electronic home monitoring until he could enter the program. The district court specifically warned R.V. that if he did not cooperate with his mother, he would probably receive an out-of-home placement.

In February 2004, R.V.'s probation officer issued an arrest-and-detention notice, alleging that R.V. had missed two gun-program meetings, had left home following a family argument, and was possibly involved in gang activities. R.V. waived his right to a probation-revocation hearing and admitted the allegations. The district court then revoked his probation and ordered him to complete the Beta program and to continue to comply with the prior court orders. R.V. was released from the Beta program in March 2004.

In May 2004, R.V.'s probation officer issued another arrest-and-detention notice, alleging that R.V. was regularly truant from school, was out of parental control, and had absconded from home continually since his release from the Beta program. R.V. was arrested and appeared for a probation-revocation hearing. R.V. did not admit any probation violations or waive his right to a contested hearing, but he agreed to waive his right to a hearing within seven days after the time of his arrest so that a 30–day evaluation could be completed. Despite R.V.'s objection, the district court placed R.V. at Bar None, a secure facility, after learning that the placement R.V. had requested was not an option.

The parties returned to court in early July, after the Bar None evaluation was completed. Proceeding under the mistaken impression that R.V. had admitted to violating probation and had waived his right to a contested hearing, the district court proceeded to the disposition stage and ordered R.V. to complete the 12–month program at the County Home School.

In late July, R.V. moved to vacate the district court's order, claiming that he had been deprived of his right to a contested hearing. R.V. also filed an appeal. Recognizing that R.V. had not in fact waived a hearing or admitted any probation violations, the district court immediately vacated its previous order and scheduled a revocation hearing for September. R.V. was ordered to remain at the County Home School pending the hearing, and R.V. dismissed the appeal.

At the September revocation hearing, the district court stated that it would consider only the allegations in the arrest-and-detention notice as the basis for the alleged probation violations. R.V. then waived his right to a hearing and admitted that he had absconded from home and that he had not attended certain classes at school.

The district court determined that R.V.'s admissions were sufficient to support a finding that he had violated his probation. Relying on the record as a whole, the district court then concluded that, given R.V.'s "extensive needs" and his "progression into extremely anti-social behavior,"

placement at the County Home School was the least-restrictive alternative available to return R.V. to law-abiding behavior and reaffirmed its July order. This appeal from the district court's September 2004 disposition order followed.

## ISSUES

I. Did the district court violate R.V.'s right to due process when revoking his probation?

II. Did the district court abuse its discretion by failing to apply the *Austin* three-step analysis in revoking R.V.'s probation?

III. Did the district court issue sufficient written findings in support of its disposition?

## ANALYSIS

The district court has broad discretion in determining whether the evidence justifies the revocation of probation. *State v. Austin*, 295 N.W.2d 246, 249–50 (Minn.1980). When choosing the appropriate disposition in a juvenile-delinquency case, the district court also is afforded broad discretion. *In re the Welfare of J.S.S.*, 610 N.W.2d 364, 366 (Minn.App. 2000). Therefore, absent a clear abuse of discretion, we will affirm a revocation order and a disposition. *Id.*

### I.

R.V. argues that the district court violated his right to due process by initially revoking his probation without a hearing and by detaining him in a secure facility pending the September hearing, without considering alternative placements. R.V. also argues that the district court violated his right to due process by revoking his probation based on status offenses and by relying on hearsay in ordering the out-of-home placement.

Although the Due Process Clause of the United States Constitution does not guarantee a minor all the procedural safeguards of a criminal trial, in a delinquency proceeding in which a juvenile's liberty is at stake, the Due Process Clause guarantees a juvenile (1) the right to written notice of the specific charges or factual allegations against the juvenile, sufficiently in advance of scheduled court proceedings to allow counsel an opportunity to prepare; (2) the right to be advised of the right to retained or appointed counsel; (3) the right to cross-examine and confront adverse witnesses; and (4) the right to assert the privilege against self-incrimination. *In re Gault*, 387 U.S. 1, 33–34, 41, 55–56, 87 S.Ct. 1428, 1446–47, 1451, 1458–59, 18 L.Ed.2d 527 (1967). A juvenile charged with a violation that would constitute a crime if committed by an adult also has a due-process right to be adjudicated only upon proof beyond a reasonable doubt. *In re Winship*, 397 U.S. 358, 368, 90 S.Ct. 1068, 1075, 25 L.Ed.2d 368 (1970). The applicable due-process standard in a juvenile proceeding is "fundamental fairness" with "an emphasis on factfinding procedures." *McKeiver v. Pennsylvania*, 403 U.S. 528, 543, 91 S.Ct. 1976, 1985, 29 L.Ed.2d 647 (1971). Whether a proceeding violates a juvenile's right to due process is a question of law, which we review de novo. *Albright v. Oliver*, 510 U.S. 266, 294, 114 S.Ct. 807, 823, 127 L.Ed.2d 114 (1994) (stating that whether the demands of due process are satisfied solely by compliance with procedural formalities is a question of law); *Carrillo v. Fabian*, 701 N.W.2d 763, 768, 2005 WL 1773989, at *3 (Minn. July 28, 2005) ("Whether due process is required in a particular case is a question of law, which we review de novo.").

The record demonstrates that R.V. received timely notice of the specific allega-

tions against him, that he was represented by counsel at all times, and that he received a hearing at which he was afforded the right to present witnesses and documentary evidence, the right to cross-examine and confront adverse witnesses, and the right not to incriminate himself. R.V. argues, nonetheless, that the district court violated his due-process rights in several ways.

■ R.V. first argues that the district court violated his due-process rights by initially revoking his probation and ordering out-of-home placement without a hearing. Admittedly, the district court initially revoked R.V.'s probation and ordered out-of-home placement without a hearing, proceeding under the mistaken assumption that R.V. had waived his right to contest the allegations that he violated his probation. But the district court vacated its order and scheduled a revocation hearing immediately after being advised of its error. Because the inadvertent due-process violation was promptly corrected, it does not warrant reversal of the district court's revocation order.

■ Second, R.V. claims that the district court violated his due-process rights by keeping him at the County Home School pending the September revocation hearing. R.V. claims that the detention was "illegal" because he was committed without a hearing. But the rules of juvenile-delinquency procedure authorize the detention of a juvenile pending a revocation hearing and only require a hearing to be held within seven days after a juvenile is taken into custody. Minn. R. Juv. Delinq. P. 15.07, subd. 1 (providing that district court may issue warrant for juvenile's arrest and detention based on written report demonstrating probable cause that juvenile violated conditions of probation); subd. 4(B) (specifying timing for revocation hearing based on whether juvenile is

taken into custody). Thus, because R.V. waived his right to a hearing within seven days after being taken into custody, the district court did not violate his right to due process by placing R.V. in a secure facility pending the September hearing.

R.V. also argues that the district court deprived him of due process by sending him to the County Home School for the predisposition evaluation, without considering his request to be sent to St. Cloud Children's Home. Even if R.V. had a due-process right to be evaluated at the place of his choice, his claim fails because the record establishes that the district court expressly considered the St. Cloud Children's Home as a placement option and asked the probation officer to determine whether there were any openings. The district court rejected the St. Cloud Children's Home only after learning that it was not a feasible option because of transportation issues. Accordingly, the record does not support R.V.'s claim.

■ Third, R.V. argues that the district court violated his due-process rights by revoking his probation and ordering out-of-home placement based solely on his admission to two status offenses. But the rules of juvenile delinquency procedure do not require the commission of a criminal act before probation may be revoked. Rather, they require only a violation of the terms of the dispositional order, whatever those terms may be. *See* Minn. R. Juv. Delinq. P. 15.07, subd. 4(D) ("If the court finds by clear and convincing evidence, or the child admits violating *the terms of the dispositional order,* the court may ... order a disposition pursuant to Minnesota Statutes, Section 260B.198." (emphasis added)). The rules also do not preclude out-of-home placement when the probation revocation is based on a status offense. Out-of-home placement is appropriate when it is necessary; is in the juve-

nile's best interests; and is suitable to the juvenile's needs, irrespective of the nature of the probation violation. Minn. R. Juv. Delinq. P. 15.05, subd. 2(B)(1), (2), (3). Although in some cases policy considerations may require that a juvenile's probation not be revoked based on a status offense, in other cases the commission of a status offense may suggest that a juvenile "cannot be counted on to avoid antisocial activity" or that revocation is necessary to protect the juvenile's health and safety. *Austin*, 295 N.W.2d at 250–51 (quotation omitted). The rules, however, protect juveniles against the reflexive revocation of probation based on an "accumulation of technical violations," a danger that the Minnesota Supreme Court has recognized in the adult context, by giving juveniles the right to present mitigating circumstances or other reasons why a violation, if proved, should not result in revocation. *Id.* (quotation omitted); Minn. R. Juv. Delinq. P. 15.07, subd. 4(A).

Fourth, R.V. argues that the revocation violated his right to due process because the conduct he admitted was not a condition of probation, and he did not receive fair notice that status offenses would lead to revocation. But the record belies his contentions. As conditions of probation, the district court required R.V. to obey the law and to complete the gun program. At the October 2003 disposition hearing, the district court elaborated as follows:

You don't like supervision, obey the law.

. . .

Obeying the law also means being in school. You are required to be in school every day, every class, until you are 18, or you've got a diploma . . . .

. . .

I'm staying the BETA program, but you should understand that the six-week BETA program is just kind of a backup for the gun program.

At the first revocation hearing in December 2003, the district court also specifically warned R.V. that if he did not cooperate with his mother or if he "[gave] her any sort of grief," he would probably receive an out-of-home placement. Additionally, R.V. signed a Notification of Conditions of Probation in May 2004, which provided R.V. written notice that, as a condition of probation, he was expected to "attend all classes at [his] assigned school program until the age of 18 unless a formal waiver has been obtained." The claim that the violations to which he admitted were not conditions of probation, therefore, is unsupported by the record.

R.V. also argues that, even if the violations to which he admitted were conditions of probation, the district court failed to give him prior fair warning that truancy and curfew violations could result in probation revocation and out-of-home placement. But, again, the record demonstrates that, when placing R.V. on probation for the current offense, the district court clearly advised R.V. that he faced out-of-home placement if he violated the conditions of his probation:

But the thing is, if it were not for that gun program, you would be going to the County Home School for a minimum of ten months. That's what we always did before we had the gun program.

And if you screwed up at the County Home School, you would be going to Red Wing for, I don't know, fifteen months, and then you would still be on probation, because you're only 15.

I mean, we're not disappearing off the face of the earth. So, you need to get (a) if you break the law, you're not in control of certain parts of your life. If you want to be free, you obey the law, and nobody messes with you. You get to go wherever you want to go, hang

with whoever you want to hang with, whatever.

But if you break the law, you lose part of your freedom. And the more you break the law, and the more you violate Court orders, the more freedom you lose.

I could today, easily, send you to the County Home School for ten months. And the reason it would be easy is (a) you have already been shot, and the law is concerned about keeping you alive and (b) you were in the area where you were shot with a big old gun that was loaded.

. . .

As [defense counsel] explained, [BETA is] the thing we do if kids are screwing around, before I send you to the County Home School for a year. It's just kind of a tune-up thing.

So, you shouldn't be thinking that *if you break the law or probation in a significant way,* you can't do anything more than BETA, because that's not the way it is.

(Emphasis added). Although the district court did not state that truancy and curfew violations could lead to out-of-home placement, it clearly stated that if R.V. broke the law *or the conditions of probation* in some significant way, out-of-home placement might follow. The conditions of probation included regular school attendance and compliance with parental rules. Thus, R.V.'s claim that he did not receive notice of the allegations on which the district court based the revocation of his probation is squarely contradicted by the record.

 R.V. next argues that the district court violated due process by relying on hearsay allegations in determining the appropriate disposition. Specifically, R.V. argues that the district court improperly considered the probation officer's disposition-review report, the Beta release summary, the Bar None evaluation, and a re-port from the County Home School about R.V.'s progress in that program. But R.V.'s claim ignores the express language of the rules and the relevant statute, both of which authorize the district court to consider reliable hearsay in determining the appropriate disposition. *See* Minn. R. Juv. Delinq. P. 15.04, subd. 2 (providing that at the disposition hearing district court "may receive any information, except privileged communication, that is relevant to the disposition of the case *including reliable hearsay and opinions*" (emphasis added)); Minn.Stat. § 260B.193, subd. 2 (2004) ("Before making a disposition in a case . . . the court may consider *any* report or recommendation made by the local social services agency [or] probation officer . . . [and] the results of the children's mental health screening provided in section 260B.157, subdivision 1." (Emphasis added)).

R.V. contends that the district court's reliance on the reports was improper because the reports were not part of the record, contained allegations beyond those in the arrest-and-detention notice, and were conjectural. There is no factual basis for these claims. The reports were clearly part of the record and there is no support for R.V.'s claim that the allegations in the reports were "conjectural." That the reports contained allegations beyond those in the arrest-and-detention notice is to be expected because the reports were submitted to assist the district court in determining the appropriate disposition, not to assist the district court in determining whether R.V. violated probation. The district court stated that, in determining whether R.V. violated probation, it would consider only the allegations in the arrest-and-detention order. There is no indication in the record that the district court failed to do so. Having found that R.V. had violated his probation, the district

court was authorized to consider all reliable information relevant to the disposition, including hearsay. R.V., in turn, had a due-process right to call as witnesses and examine under oath the authors of the reports to which he now objects and to otherwise rebut any adverse facts in the reports. Minn. R. Juv. Delinq. P. 15.07, subd. 3(B)(4) & cmt.

Finally, R.V. argues that the district court failed to consider less-restrictive alternatives that would have been appropriate sanctions for status offenses, including Rainbow Bridge, Chisholm Home, Woodland Hills, Stepping Stone, and electronic home monitoring. Even if the district court's placement choice were a matter of due process, R.V.'s claim would fail because he only specifically requested consideration of Rainbow Bridge and Chisholm Home, which the district court considered and rejected on the record at the July hearing and in its July order.

R.V.'s claim that the district court violated his due-process rights in the course of revoking his probation is, therefore, without merit.

## II.

R.V. next argues that the district court violated due process by revoking his probation and imposing long-term, out-of-home placement without complying with the three-step analysis set forth in *Austin*, 295 N.W.2d at 250.

In *Austin*, the Minnesota Supreme Court ruled that, before probation can be revoked in a criminal case, the district court must (1) designate the specific conditions that were violated, (2) find that the violation was intentional or inexcusable, and (3) find that the need for confinement outweighs the policies favoring probation. *Id.* The *Austin* court reasoned that, because the purpose of probation is rehabilitative, "revocation should be used only as a

last resort when treatment has failed." *Id.* The supreme court also noted that "[t]he decision to revoke cannot be a reflexive reaction to an accumulation of technical violations but requires a showing that the offender's behavior demonstrates that he or she cannot be counted on to avoid antisocial activity." *Id.* at 251 (quotations omitted).

The supreme court extended the application of *Austin* to extended-jurisdiction-juvenile (EJJ) proceedings in *State v. B.Y.*, reasoning that (1) by requiring a finding that "reasons exist to revoke [a] stay," the EJJ statute precludes the automatic or reflexive execution of an adult sentence, and (2) the need to balance a probationer's interest in freedom against the state's interest in ensuring rehabilitation and public safety is present in EJJ proceedings because "revocation of EJJ probation may result in the execution of an adult sentence." 659 N.W.2d 763, 768–69 (Minn. 2003).

R.V. argues that, because juvenile revocation proceedings are analogous to EJJ revocation proceedings, *Austin* should apply to juvenile revocation proceedings. But juvenile revocation proceedings are not analogous to adult and EJJ proceedings because juveniles do not face an executed adult sentence upon violating probation. Thus, the concerns that justify the application of *Austin* to EJJ revocation proceedings do not require the extension of *Austin* to juvenile revocation proceedings.

Most important, the wholesale adoption of *Austin* in juvenile revocation proceedings is unnecessary because the rules of juvenile-delinquency procedure encompass the procedural safeguards that *Austin* guarantees in adult and EJJ proceedings. Indeed, the extension of *Austin* to juvenile proceedings would not be prudent because

the juvenile rules afford non-EJJ juvenile probationers better protection against the reflexive execution of a stayed disposition requiring confinement in a secure facility than *Austin* would afford.

The first *Austin* factor, for example, requiring the district court to identify the specific conditions that the probationer violated, is encompassed by Minn. R. Juv. Delinq. P. 15.07, subd. 4(D), which requires that, before revoking probation and ordering a disposition, the district court must find by clear and convincing evidence that the juvenile violated the terms of a disposition order. To find a violation of the terms of the disposition order by clear and convincing evidence, the district court must necessarily identify the specific conditions that the probationer violated, as *Austin* requires. And, as a matter of fundamental fairness, the district court must also ensure that the conditions that the probationer is alleged to have violated were actually imposed and that the juvenile had notice that violation of the conditions of probation could result in revocation. *See State v. Ornelas*, 675 N.W.2d 74, 79–80 (Minn.2004) (reversing revocation of adult probationer's probation because condition alleged to have been violated was not imposed by district court); *B.Y.*, 659 N.W.2d at 769 (stating that EJJ revocation must be based on condition found in disposition order).

The second *Austin* factor requires the district court to find that the violation was intentional or inexcusable. Although the juvenile rules do not require such a finding, they give juveniles the right "to present mitigating circumstances or other reasons why [a probation] violation, if proved, should not result in revocation." Minn. R. Juv. Delinq. P. 15.07, subd. 4(A). The rules thus afford a juvenile the same protection against the automatic revocation of probation that the second *Austin* factor

seeks to ensure. Because the presumptive consequence of a probation violation in the juvenile setting is not the execution of an adult sentence, the juvenile rules appropriately do not require a specific finding that the probation violation was intentional or inexcusable. In a rehabilitative setting, requiring the district court to revoke probation only upon a finding that a violation was inexcusable would unreasonably limit the district court's ability to intervene when a violation, although excusable, suggests that the juvenile might be a danger to himself or herself or others or that the juvenile may not be counted on to avoid antisocial behavior. Because, by requiring the district court to consider mitigating circumstances, the juvenile rules sufficiently protect a juvenile in a non-EJJ proceeding against the reflexive revocation of probation while at the same time preserving the discretion the district court must have to intervene on the juvenile's behalf, the wholesale extension of the second *Austin* factor to the juvenile proceeding is neither necessary nor appropriate.

The third *Austin* factor, requiring the district court to find that the need for confinement outweighs the policies favoring probation, is not applicable to juvenile proceedings because confinement in a secure facility is not the presumptive consequence of violating probation in the juvenile setting. *See* Minn.Stat. § 260B.198 (2004) (listing authorized juvenile dispositions). Rather, it is one of a number of dispositional options available to the district court. *Id.*, subd. 1(d). The rules of juvenile-delinquency procedure nevertheless encompass the balancing of interests that the third *Austin* factor requires to prevent the reflexive execution of an adult sentence. Indeed, the juvenile rules afford minors greater protection against the reflexive imposition of long-term, out-of-

home placement than the third *Austin* factor would afford.

The juvenile rules require the district court to ensure that a disposition is necessary to restore law-abiding conduct. Minn. R. Juv. Delinq. P. 15.05, subd. 2(B)(1). In determining whether a particular disposition is necessary, the district court must consider the risk to public safety and whether the disposition ordered is the least-restrictive action consistent with the juvenile's circumstances. *Id.* A disposition order must contain written findings of fact, setting forth why public safety and the juvenile's best interests are served by the disposition, what alternative dispositions were recommended, and why the recommended dispositions were rejected. *Id.,* subd. 2(A)(1), (2). When the disposition changes the juvenile's place of custody, the disposition order must set forth the reasons that public safety and the juvenile are not served by preserving the present custody and why the new placement is suitable to the juvenile's needs. *Id.,* subd. 2(A)(3). When contemplating out-of-home placement, the district court must consider whether the placement is appropriate to address the juvenile's needs, keeping in mind that the juvenile's best interests ordinarily are served by parental custody. *Id.,* subd. 2(B)(3). Thus, the juvenile-delinquency rules not only incorporate the third *Austin* factor's balancing requirement, but also afford juveniles greater protection than the third *Austin* factor would afford.

Based on the foregoing, we conclude that the district court did not abuse its discretion by declining to apply the *Austin* factors when it revoked R.V.'s probation.

### III.

██ R.V. finally argues that the district court failed to make adequate findings in support of its disposition order.

If a district court finds by clear and convincing evidence that a juvenile violated the terms of a disposition order, the district court must order a disposition authorized by Minn.Stat. § 260B.198. "Any order for a disposition authorized under [Minn. Stat. § 260B.198] shall contain written findings of fact to support the disposition ordered" and shall set forth why the disposition serves the juvenile's best interests and what alternative dispositions the district court considered and the reasons that they were rejected. Minn.Stat. § 260B.198, subd. 1(m). Because probation revocation is a disposition authorized under Minn.Stat. § 260B.168, subds. 1(b), 9, a district court must make written findings when revoking probation. The findings are necessary to facilitate meaningful appellate review, to show that the district court considered all of the relevant factors, and to enable the parties to understand the decision. *In re the Welfare of N.T.K.,* 619 N.W.2d 209, 211 (Minn.App.2000).

██ Similarly, when out-of-home placement is ordered, the district court must make findings as to (1) why this disposition serves public safety, (2) why it is in the juvenile's best interests, and (3) why the district court rejected recommended alternative dispositions. Minn. R. Juv. Delinq. P. 15.05, subd. 2(A); *In re the Welfare of C.A.W.,* 579 N.W.2d 494, 497–98 (Minn. App.1998). When changing the location of the juvenile's custody, the district court also must make findings as to (1) why public safety and the juvenile's best interests are not served by preserving the status quo, and (2) how the program available at the custodial placement serves the juvenile's needs. *Id.* The failure to make the required findings constitutes reversible error. *N.T.K.,* 619 N.W.2d at 211–12.

When imposing a disposition, the district court considers whether a particular disposition is necessary to restore law-abiding

conduct. Minn. R. Juv. Delinq. P. 15.05, subd. 2(B)(1). In determining whether a particular disposition is necessary, the district court must consider the effect of the disposition on public safety. *Id.*, subd. 2(B)(1)(a). The risk to public safety is measured by the seriousness of the offense, the juvenile's culpability, the juvenile's prior record of delinquency, and the juvenile's programming history. *Id.*

The district court made no findings as to any of the considerations relevant to public safety. The record contains no mention of the seriousness of the offense or of R.V.'s culpability, prior record of delinquency, or programming history. The district court's findings are thus insufficient to facilitate meaningful appellate review and to show that the district court considered the effect of its disposition on public safety. *Cf. In re the Welfare of J.S.S.*, 610 N.W.2d 364, 367 (Minn.App.2000) (concluding that findings on juvenile's prior offenses of truancy and disorderly conduct and on his tendency to re-offend after completing out-of-home placement were sufficient to show why public safety would be served by long-term, residential treatment program). Given that R.V. had not committed new criminal acts, findings explaining why out-of-home placement was necessary to ensure public safety are particularly important.

The district court's fear that R.V. was headed toward adult certification is insufficient, by itself, to establish that the disposition was necessary to ensure public safety. Without explicit findings addressing evidence supporting the basis for this concern, the mere promise that long-term, out-of-home placement would benefit R.V. by keeping him from being certified as an adult is insufficient to establish that the disposition is necessary. *In re the Welfare of L.K.W.*, 372 N.W.2d 392, 399 ("The promise of benefits in a disposition, that

the choice would be good or even best, does not permit an action which is not necessary.").

Thus, although the district court ordered a disposition that it considered to be in R.V.'s best interests overall, the findings do not address whether the disposition was necessary to restore him to law-abiding conduct and protect public safety.

Rule 15.05 also requires that, in determining whether a particular disposition is necessary, the district court consider and issue findings as to how the disposition serves the juvenile's best interests. Minn. R. Juv. Delinq. P. 15.05, subd. 2(B)(2). Considerations of best interests do not supersede the requirement that the disposition be necessary. "The promise of benefits in a disposition, or even the suggestion that a particular disposition is best for the child, does not permit a disposition that is not necessary." *Id.* "Public policy mandates that the best interests of the child are normally served by parental custody." *Id.*, subd. 2(B)(3). A placement that is not suited to the juvenile's actual needs cannot serve the juvenile's best interests. *Id.*

The district court found that R.V. needed a highly structured environment because of a "dramatic list of [unresolved] issues" and an emerging antisocial personality. The district court also found that the County Home School "offer[ed] a very stringent, regimented, long-term program that is best suited to help the child rehabilitate himself." But the district court did not identify specific interests that would be served by out-of-home placement or explain why those interests would be best served by a stringent and regimented long-term program like the County Home School. *See J.S.S.*, 610 N.W.2d at 367 (concluding that findings that juvenile's best interests "shall be served by an out-of-home placement at this time" and juve-

nile has "continued to re-offend upon returning to his home from previous out-of-home placement" not sufficient); *C.A.W.,* 579 N.W.2d at 498 (remanding for findings where district court "identif[ied] no interests of the child that are served by or two- or three-week incarceration in a residential facility"). The bare conclusion that the County Home School's stringent and regimented program was best suited to help R.V. rehabilitate himself is insufficient to satisfy the written-findings requirement. *See In re the Welfare of J.A.J.,* 545 N.W.2d 412, 414–15 (Minn.App.1996) (stating that bare conclusion that child's best interests require particular disposition is insufficient and finding inadequate statement that "it is in the best interests of the child to be placed in a residential treatment center to address his present personality and psychological disorders [and] outpatient treatment environment shall not meet the needs of the child").

In determining whether a particular disposition is necessary, the district court must also consider and make findings on proportionality, i.e., whether the disposition is "the least restrictive action consistent with the child's circumstances." Minn. R. Juv. Delinq. P. 15.05, subd. 2(B)(1)(b).

The district court rejected R.V.'s request for placement at Chisholm House or the WAVE program, finding that Chisholm House was "better suited for treating younger, less sophisticated children" and that R.V. needed a "very stringent, regimented, long-term program" like the County Home School to rehabilitate himself. The district court also found that R.V. was not amenable to supervised probation in the community, specifically noting his failure to complete the Beta and gun programs. The district court's findings suggest that, because R.V. continued to violate the conditions of supervised probation in the community, it is now appropriate to try a different disposition in a secure facility. The district court's findings on alternative dispositions thus are sufficient to satisfy the written-findings requirement.

R.V. claims that the district court failed to consider his recent enrollment in the WAVE alternative school near his house; his willingness to attend Rainbow Bridge; and the possibility of enrolling in the CAMP program, a program that would have allowed him to continue to go to school and be employed. But R.V.'s counsel did not present these alternatives to the district court. R.V.'s July 26, 2004 modification motion suggested only Chisholm House, which the district court considered and rejected. Accordingly, the district court's findings on alternative dispositions are adequate.

When the disposition changes the juvenile's place of custody, the district court also is required to consider and make findings on why public safety and the juvenile's best interests are not served by preserving the status quo. Minn. R. Juv. Delinq. P. 15.05, subd. 2(A)(3)(a). The rule is "a reminder of the preference for placing children in their own home, and it calls for attention to the families of the children." *J.S.S.,* 610 N.W.2d at 367–68. We have indicated that "[c]orrectional placements cannot occur without evidence and findings reflecting consideration of the child's familial relationships." *C.A.W.,* 579 N.W.2d at 499.

The district court found that R.V. was unamenable to supervised probation in the community, noting that he had failed to complete the Beta and gun programs. But the district court did not make findings reflecting that it had considered R.V.'s familial relationships when committing R.V. to the County Home School. The district court incorporated the Bar None evalua-

tion into its order, and the evaluation contains some information about R.V.'s familial relations. But the evaluation is not an adequate substitute for the requisite findings, even though it supports the district court's implicit determination that out-of-home placement is necessary to return R.V. to law-abiding behavior. *See In re the Welfare of J.L.Y.*, 596 N.W.2d 692, 696 (Minn.App.1999) (stating that despite "the administrative efficiency of [a pre-printed disposition] form and that in many cases the sound reasons for the disposition ordered are on the record [the incorporation of] the entire transcript into the [disposition] order does not satisfy the written-findings requirement"), *review granted* (Minn. Sept. 28, 1999), *appeal dismissed* (Minn. Feb. 15, 2000). *But see In re the Welfare of D.T.P.*, 685 N.W.2d 709, 713 (Minn.App.2004) ("If the requisite particularized findings are made on the record and appear in a transcript, it is appropriate for the district court to incorporate those findings by reference into its order."). The incorporation of the Bar None evaluation into the district court's order did not effectuate the purposes of written findings, namely, to guarantee that the district court considers the appropriate factors in making a disposition, to enable the parties to understand the district court's decision, and to facilitate appellate review. *See N.T.K.*, 619 N.W.2d at 211. The findings related to R.V.'s present custody arrangement, therefore, are insufficient to satisfy the requirements of the rule.

When the disposition modifies the juvenile's place of custody, the district court must also consider and make findings on the "suitability of the placement, taking into account the program of the placement facility and assessment of the child's actual needs." Minn. R. Juv. Delinq. P. 15.05, subd. 2(A)(3)(b).

The district court found that R.V. needed a "highly structured environment" because of a "dramatic list of [unresolved] issues" and "the apparent emergence of an anti-social personality." The district court also found that the County Home School provided the type of "very stringent, regimented, long-term program" R.V. needs to rehabilitate himself and that "placement of at least twelve months is necessary to return the child to law-abiding behavior."

The district court stated at the disposition hearing that R.V. had chemical-dependency, anger, school-attendance, and family-relationship issues. But the district court did not explain why the County Home School's program was best suited to address those issues. The district court referred to the stringent and regimented nature of the program but did not describe the program's therapeutic offerings or explain how the program would address R.V.'s needs. *See In re the Welfare of M.A.C.*, 455 N.W.2d 494, 499 (Minn.App. 1990) (reversing disposition when district court "made no findings explaining why Chisholm House would serve appellant's best interests ... [or] describe[d] the type of treatment provided with Chisholm House or how that treatment would help solve appellant's problems"); *In re the Welfare of M.R.S.*, 400 N.W.2d 147, 151 (Minn.App.1987) (remanding when district court made no finding as to juvenile's specific problems and the suitability of placement ordered as a remedy for them); *see also N.T.K.*, 619 N.W.2d at 212 (holding that although findings that present placement failed and placement ordered was the least-restrictive alternative necessary to return appellant to law-abiding behavior "address[ed] some of the [relevant] factors and the evidence may very well ultimately support the disposition, the findings lack the completeness required by statute and rule"). The reason for the district court's dispositional choice appears to have been

the need for a secure facility. The findings, however, do not address how the County Home School program would address R.V.'s therapeutic needs.

The district court's findings on public safety, the juvenile's best interests, the adequacy of the present custodial arrangement, and the suitability of the placement ordered are insufficient to satisfy the requirements of Minn.Stat. § 260B.198, subd. 1(m) and Minn. R. Juv. Delinq. P. 15.05, subd. 2. Although the evidence may support the disposition ultimately, the findings lack the completeness required to guarantee that the district court considered the relevant factors. The findings are similarly inadequate to permit meaningful appellate review of R.V.'s claim that the district court abused its discretion by ordering long-term, out-of-home placement.

## DECISION

The district court did not violate R.V.'s due-process rights in the course of revoking his probation. Nor did the district court err by failing to apply the *Austin* three-step analysis in revoking R.V.'s probation. But the district court failed to issue sufficient findings to ensure that it considered all the relevant factors and to facilitate appellate review. We, therefore, affirm the district court's revocation of R.V.'s probation, reverse the disposition, and remand for additional findings addressing the placement ordered.

**Affirmed in part, reversed in part, and remanded.**